IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 20, 2016 Session

## IN RE ESTATE OF GERTRUDE BIBLE LINK

**Appeal from the Chancery Court for Marion County**
**No. 7677, PR135     Jeffrey F. Stewart, Chancellor**
_____

**No. M2015-02280-COA-R3-CV – Filed February 22, 2017**
_____

This is an appeal from a jury trial in a will contest.  The jury returned a verdict finding that the contested will was valid.  The contestants have appealed, raising numerous issues and arguing that the evidence presented does not support the jury's verdict.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed
and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which RICHARD H. DINKINS and KENNY ARMSTRONG, JJ., joined.

Jackie Sharp, Jr. and Natalie R. Sharp, Nashville, Tennessee, for the appellants, Carlynn D. Newcom, Reed B. Durham, and Don E. Durham.

Ronnie J. T. Blevins, II, Jasper, Tennessee, and Jared C. Smith, South Pittsburg, Tennessee, for the appellee, James Clifford Layne.

## OPINION

### I. BACKGROUND AND PROCEDURAL HISTORY

This is an action to contest the validity of a document purporting to be the last will and testament of Gertrude Bible Link.  For clarity, we will briefly summarize Ms. Link's relevant family relationships before discussing the circumstances surrounding the document's execution and the procedural history of this case.

Ms. Link was born on January 6, 1915.  She graduated from Middle Tennessee State University and worked for many years as a schoolteacher in Marion County, Tennessee.  She married Harlen Link in 1939, and they remained married until Mr. Link died in 1992.  Although Ms. Link did not have any children, she maintained close

relationships with her family. Ms. Link had a particularly close relationship with her younger sister, Cathryn Durham. Ms. Link and Ms. Durham attended college together and shared a life-long interest in gardening. They formed a local gardening club together and traveled to various flower and garden shows. Ms. Durham's children–Carlynn Newcom, Don Durham, and Reed Durham–also had close relationships with Ms. Link growing up. Clifford Layne is the son of Ms. Link's older sister, Bonnie Layne.[1] Mr. Layne has been a general sessions and municipal court judge in Marion County since 1974. As she grew older, Ms. Link relied on Mr. Layne for advice in ordering her legal and financial affairs.

In 1989, Ms. Link approached Mr. Layne for legal advice, and he referred her to Zach Kelly, a local attorney with whom he had a personal and professional relationship. Mr. Kelly drafted a will for Ms. Link, and she executed it in May 1989. Ms. Link's 1989 will named Mr. Layne as executor of her estate and, in pertinent part, provided that if she survived her husband, her property would be distributed in equal shares to Cathryn Durham, Carlynn Newcom, Reed Durham, Donald Durham, and Clifford Layne.

In 1996, Ms. Link asked Mr. Layne if he would be willing to serve as her attorney-in-fact. Once again, he referred her to Mr. Kelly. Mr. Kelly drafted a general power of attorney authorizing Mr. Layne to act on Ms. Link's behalf in all matters, and Ms. Link executed it in March 1996. At trial, Mr. Layne testified that he drove Ms. Link to Mr. Kelly's office to execute the power of attorney and waited in the lobby while she met with Mr. Kelly. Although the document was effective upon execution, there is no evidence that Mr. Layne acted as Ms. Link's attorney-in-fact prior to 2001.

In 1998, Ms. Link executed the document at issue in this case. According to Mr. Layne, Ms. Link told him that she intended to make a new will that would leave all of her property to him with the exception of a $10,000 devise to her church. Mr. Layne drove Ms. Link to Mr. Kelly's office where she met with Mr. Kelly alone while Mr. Layne waited in the lobby. A handwritten note purportedly written by Mr. Kelly was admitted as evidence at trial. In pertinent part, the note states:

3/5/98 Conf w/ Mrs. Gertrude Link

I met w/ her alone in my office.\
She was well aware of what she wanted
to do.

---

[1] Ms. Link had other siblings, nieces, and nephews, but the record contains little information about them, and they are not relevant to this appeal.

If estate exceeds $300,000 leave $10,000
to church.

Leave everything else outright
to Clifford Layne.  He is to
handle as he sees fit!!
I mentioned Betty but she said not at this time.

On March 11, 1998, Ms. Link executed a document drafted by Mr. Kelly that provided, in pertinent part, as follows:

LAST WILL AND TESTAMENT

OF

GERTRUDE B. LINK

I, Gertrude B. Link, of Marion County, Tennessee, being of sound and disposing mind and memory, do hereby make, publish and declare this to be my Last Will and Testament, hereby revoking all prior testamentary instruments.

ARTICLE I

I direct my Executor: to pay all of my just debts, funeral expenses, costs of administration and taxes out of my general estate, as soon as practicable after my death.

ARTICLE II

If the value of my personal estate, excluding the value of my real estate, personal effects, automobiles, clothing, jewelry, and household furnishings and furniture, is equal to or exceeds the sum of Three Hundred Thousand ($300,000.00) Dollars, then I do hereby make the following devise:

A. To the First Baptist Church of Jasper, Tennessee, the sum of Ten Thousand ($10,000.00) Dollars, to be utilized only for building and/or renovation purposes.

ARTICLE III

- 3 -

I do hereby give, devise and bequeath all of the rest, residue and remainder of my estate, including both realty, and personalty, and wherever located, in fee simple and absolutely, to my nephew, James Clifford Layne.

ARTICLE IV

I appoint my nephew, James Clifford Layne, as Executor of this my Last Will and Testament.

Both pages of the two-page document bear the handwritten initials "GL," and the second page bears Ms. Link's signature as "Testatrix." Mr. Kelly and his assistant, Danielle Steele, signed the document as witnesses to its execution and also signed an attached affidavit affirming that Ms. Link signed the will in their presence and that they attested the will in her presence and in the presence of each other. The affidavit bears the handwritten initials "GL" and reflects that it was notarized by Marty Murphy, another of Mr. Kelly's assistants. The document does not contain any reference to Cathryn Durham, Carlynn Newcom, Don Durham, or Reed Durham.

In 2005, Cathryn Durham died. In 2007, with Ms. Link suffering from dementia, Mr. Layne authorized her admission to a nursing home and began using his power of attorney to exercise full control over her finances. From 2007 to 2012, Mr. Layne exercised his power of attorney to pay for the upkeep of Ms. Link's house, her nursing home expenses, and various other expenses from Ms. Link's funds. In 2012, with Ms. Link's health deteriorating further, Mr. Layne contacted Carlynn Newcom to discuss selling Ms. Link's house. Ms. Newcom agreed that they should sell the home if Ms. Link was not going to live in it again. Around that time, Mr. Layne cleaned out Ms. Link's house and threw away numerous documents and other items. At Ms. Link's direction, Mr. Layne contacted Carlynn Newcom, Don Durham, and Reed Durham prior to selling the house and allowed them to come take any items they wanted from it. Ms. Link died in December 2012.

In January 2013, Mr. Layne filed a petition to probate Ms. Link's 1998 will. In May 2013, Carlynn Newcom, Don Durham, and Reed Durham (collectively, the "Contestants"), filed an amended complaint contesting the validity of the 1998 will. In the complaint, they alleged that the will was a forgery. Alternatively, they alleged that Ms. Link did not possess requisite testamentary capacity or testamentary intent when she signed the will and that the will was procured through undue influence or fraud.[2] They asserted that the 1998 will should be set aside and Ms. Link's estate should be distributed

---

[2] Although the Contestants' amended complaint lists "Mistake" as a separate basis for their will contest, the allegations related to it are substantively identical to those in the section titled "Testamentary Intent."

- 4 -

according to the terms of the 1989 will. Mr. Layne filed an answer denying the material allegations of the amended complaint, and the trial court entered a scheduling order that established various discovery deadlines.

Following a period of discovery, the Contestants filed a motion for partial summary judgment asserting that undisputed material facts established (1) that Mr. Layne had a confidential relationship with Ms. Link prior to her execution of the 1998 will, (2) that Mr. Layne's close relationship with Mr. Kelly rendered Mr. Kelly incapable of providing Ms. Link with independent advice, and (3) that Mr. Layne prejudiced the Contestants by destroying documents relevant to their case. Mr. Layne opposed the motion, and the trial court denied it based on its conclusion that material facts were in dispute.

The case was set for a jury trial scheduled to begin on July 21, 2015. The day before trial, Mr. Layne's attorney spoke with Mr. Kelly's wife, Elizabeth Kelly. Ms. Kelly informed Mr. Layne's attorney that Mr. Kelly would not be able to testify at trial due to his deteriorating health. She also informed him that she had photocopies of the handwritten notes Mr. Kelly wrote during his meeting with Ms. Link. Mr. Layne's attorney immediately notified the Contestants' attorneys of his intent to present Ms. Kelly as a witness regarding Mr. Kelly's unavailability and to present the handwritten notes as evidence that Ms. Link received independent advice regarding the will. The Contestants objected to the late-disclosed evidence at the outset of trial the following day. After listening to arguments from both sides, the trial judge noted that both parties could have attempted to depose Mr. Kelly or subpoena his records related to Ms. Link's 1998 will and chose not to do so. The judge ruled that Ms. Kelly would be permitted to testify regarding Mr. Kelly's health but indicated that he would reserve ruling on the admissibility of the handwritten notes. Thereafter, the parties presented their proof to the jury.

Initially, Mr. Layne presented evidence intending to demonstrate that the 1998 will was executed in compliance with the formalities of law. To that end, Ms. Kelly testified that Mr. Kelly was not able to testify because he suffered a stroke in 2011 that left him partially paralyzed and severely affected his ability to communicate. She explained that, as a result of his condition, she spent an inordinate amount of time each day trying to communicate with him to accomplish simple tasks. Ms. Kelly also identified Mr. Kelly's signature on the 1998 will. In light of Ms. Kelly's testimony, the trial court later indicated its satisfaction that Mr. Kelly was not an available witness. The will's other subscribing witness and the notary public who acknowledged the witnesses signatures also testified. Ms. Murphy and Ms. Steele both testified that Mr. Kelly was very professional and followed the same strict protocol every time he drafted a will for a client. They explained that, before drafting the will, Mr. Kelly always met with the client

alone in his office to discuss the client's intentions. When the client returned to execute the will, Mr. Kelly allowed only the client, the necessary witnesses, and the notary to be in the room. Any person that accompanied the client to the office was required to wait outside. Although neither Ms. Murphy nor Ms. Steele specifically remembered the execution of Ms. Link's will in 1998, they identified their own signatures and Mr. Kelly's signature on the document. As such, the trial court admitted Ms. Link's 1998 will into evidence.

Next, the Contestants presented evidence aimed at demonstrating that the document purporting to be Ms. Link's 1998 will was invalid. Carlynn Newcom testified at length regarding the close relationship Ms. Link shared with her mother and maintained that it never changed. She produced a copy of Ms. Link's 1989 will, which, she testified, Ms. Link gave to her shortly after executing it. Ms. Newcom testified that she visited Ms. Link in the nursing home every week, and Ms. Link never mentioned changing her 1989 will or having another will. She explained that she and her brothers first learned about the 1998 will after Ms. Link died when Mr. Layne told them that she left everything to him. Although she acknowledged that Ms. Link did not discuss her finances openly, Ms. Newcom maintained that Ms. Link would not have disinherited her family without saying something. Nevertheless, she admitted that she had no evidence that Ms. Link's 1998 will was invalid. Ms. Newcom acknowledged that Ms. Link had her wits about her "[m]ost of the time" in 1998 and that, to her knowledge, Ms. Link was not afraid of Mr. Layne or under any emotional distress. Don Durham and Reed Durham also testified, and their testimony differed little in substance from Ms. Newcom's testimony. Both testified that Ms. Link did not discuss her finances with them but maintained that she would not have disinherited their mother. Don Durham testified that Ms. Link appeared to have her wits about her in 2001. Similarly, Reed Durham testified that she appeared to have her wits about her in 1998. Reed Durham also testified that Ms. Link thought "very highly" of and trusted Mr. Layne. Ryan Phillips testified that he lived near Ms. Link and began doing odd jobs for her about once a week starting in 1997. Mr. Phillips testified that he never heard Ms. Link mention Mr. Layne in the eight or nine years he worked for her, although she spoke often about Ms. Durham, who he knew from church. He testified that Ms. Link appeared to be in her right mind, although she seemed "elderly." He explained that Ms. Link was trusting and that someone probably could have taken advantage of her. Fred Newcom, Carlynn Newcom's husband, testified that Mr. Layne told him in 2005 that he did not know anything about Ms. Link's finances. He testified that, in a later conversation, Mr. Layne told him that he had stopped visiting Ms. Link in the nursing home.

The Contestants also presented testimony of Mr. Layne. Mr. Layne agreed that Ms. Link was very close with Ms. Durham, but testified that he grew close with Ms. Link in her later years. He admitted, however, that his only evidence of their relationship was

her 1996 power of attorney and her 1998 will. Mr. Layne was questioned at length regarding his failure to produce various documents that were presumably in Ms. Link's possession during her lifetime. Mr. Layne acknowledged that he did not know what happened to Ms. Link's driver's license, marriage license, or credit card receipts. He testified that Ms. Link had drawers full of check stubs, bank statements, and tax returns dating back to the 1940s and explained that he threw away numerous documents and other items when he was preparing Ms. Link's house to be sold. Nevertheless, he maintained that he did not throw away anything he considered to be important and did not destroy any documents in anticipation of the litigation. Mr. Layne testified that Ms. Link told him what would be in her 1998 will before she met with Mr. Kelly about it. He testified that he drove her to Mr. Kelly's office and waited in the lobby while she met with him. He acknowledged that he could not produce any documentation showing who paid Mr. Kelly to draft Ms. Link's 1998 will but explained that Ms. Link likely had because she handled her own transactions at the time. Mr. Layne acknowledged that he had been friends with Mr. Kelly for more than 40 years. He testified that the two had been on fishing trips together in the past but maintained that they did not take any trips together in the 10 years prior to 1998. He also testified that Mr. Kelly had served as his personal attorney in various matters through the years. Mr. Layne testified that he visited Ms. Link every week when she was in the nursing home and felt obligated to take greater care of her knowing the contents of her 1998 will. When asked why he never told anyone about Ms. Link's 1998 will, Mr. Layne answered that it was not his information to tell.

After the Contestants concluded the presentation of their case-in-chief, Mr. Layne presented additional witness testimony. Ronald Case testified that he was the director of Ms. Link's nursing home and served as her chaplain while she was there. Mr. Case testified that he saw Mr. Layne at the nursing home every week but that he did not recognize the Contestants. Joyce Ann Parker testified that she was Ms. Link's niece and a first cousin of Mr. Layne and the Contestants. Ms. Parker testified that she had frequently visited Ms. Link's nursing home to see her mother-in-law and saw Mr. Layne and his wife there many times. She testified that she saw Carlynn Newcom there once but stated that she never saw Don or Reed Durham. Gene Rountree testified that he was employed by Ms. Link's nursing home and that he saw Mr. Layne visiting her there "periodically." Mr. Rountree testified that he did not recognize any of the Contestants.

At the end of the second day of trial, the trial court excused the jury and held an evidentiary hearing on the admissibility of the photocopied handwritten notes purportedly written by Mr. Kelly during his meeting with Ms. Link. During the hearing, Ms. Murphy identified Mr. Kelly's handwriting in the notes and testified that they were typical of the notes Mr. Kelly would write when meeting with a client. She explained that, at some point, Mr. Kelly's files were scanned onto a computer and the original copies were destroyed. Ms. Kelly also identified Mr. Kelly's handwriting in the notes. She explained

that, when Mr. Kelly closed his law office, she scanned all of his files onto a computer and shredded the originals. After hearing their testimony and considering the arguments of the parties, the trial court ruled that the handwritten notes were to be admitted as evidence. When the jury returned the following morning, Ms. Kelly authenticated the handwritten notes and they were admitted into evidence.

After the conclusion of proof and closing arguments, the trial court read its instructions to the jury. The judge instructed the jury on the burdens applicable to each of the grounds listed in the Contestants' amended complaint for contesting Ms. Link's 1998 will: forgery, lack of testamentary capacity, lack of testamentary intent, undue influence, and fraud. The jury was given a verdict form requiring it to answer certain questions related to each of the grounds instructed by the judge and was excused to deliberate at 1:00 pm. At 4:39 pm, the judge informed the parties' attorneys that he had received word from the bailiff that the jury did not expect to reach a verdict that night and that several of the jurors would be unable to return the following day. The judge explained that he could declare a mistrial but suggested that he could give the jury "a little dynamite charge" to emphasize the importance of their efforts. The attorneys did not object to the court giving the jury a supplemental instruction, and the jury was brought back into the courtroom. In its supplemental instruction, the judge noted the time and money each side had invested in trying the case and encouraged the jurors to be willing to reexamine their own views. Sometime thereafter, the parties' attorneys notified the judge that they would accept a majority verdict, but the judge encouraged them to give the jury more time to reach a unanimous verdict.[3] At 6:32 pm, the jury announced its unanimous verdict upholding Ms. Link's 1998 will. Specifically, the jury found that (1) Ms. Link had the testamentary capacity to execute the contested will, (2) Ms. Link had the testamentary intent to execute the contested will, (3) the contested will was not forged, (4) the contested will was not the product of undue influence, (5) the contested will was not the product of fraud, and (6) the document executed on March 11, 1998 was Ms. Link's valid, executed last will and testament.

On August 21, 2015, the Contestants filed a post-judgment motion for a judgment notwithstanding the verdict or new trial. In the motion, they argued that the trial court should enter a judgment notwithstanding the verdict because no material evidence was presented at trial to support the jury's verdict. Alternatively, they argued that they were entitled to a new trial because the jury's verdict was contrary to the weight of the evidence, contrary to law, and the result of errors committed by the trial court. They

---

[3] Although this discussion took place off the record, the trial judge recounted it on the record during a subsequent hearing on the Contestants' post-judgment motion. Neither party disputed the accuracy of the judge's account of the conversation during the post-judgment hearing, and neither party disputes it on appeal.

proceeded to list 43 alleged errors made by the trial court that they argued impaired their right to a fair trial and resulted in an erroneous verdict.

The trial court held a hearing on the Contestants' post-judgment motion on October 6, 2015. Although the judge declined to address each of the 43 errors listed in their motion, he was particularly concerned with one of them–"38. The trial judge engaged in *ex parte* communications with the jury." He stated that he had, in fact, communicated with the jury off the record and outside the presence of the attorneys. He explained that, in response to a report of possible juror intimidation, he reiterated his earlier jury instructions by encouraging the juror to consider the opinions of others. He further explained that, immediately after the incident, he disclosed it to the attorneys for both parties and neither party objected. He stated that, although he regretted not putting the exchange on the record, he did not think it warranted a new trial. The trial court entered an order denying the Contestants' post-judgment motion on November 9, 2015. The Contestants timely filed an appeal to this Court on November 30, 2015.

## II. ISSUES

The Contestants raise issues for our review, which we restate as follows:

1. Whether the trial court committed reversible error in denying the Contestants' motions for partial summary judgment and judgment notwithstanding the verdict.

2. Whether the trial court abused its discretion in controlling the course of trial and witness examination.

3. Whether the trial court abused its discretion in its evidentiary rulings.

4. Whether the trial court committed reversible error in delivering inaccurate and incomplete jury instructions and in using the verdict form that was given to the jury.

5. Whether the trial court committed reversible error in delivering its supplemental instructions and in engaging in *ex parte* communications with the jury.

6. Whether the trial court committed reversible error in performing its duty as the thirteenth juror.

7.    Whether there is material evidence in the record to support the jury's verdict.

## III. STANDARD OF REVIEW

With the constitutional underpinning of the right to a jury trial framing the appellate process, Tennessee Rule of Appellate Procedure 13(d) narrowly limits the role of appellate courts in reviewing the factual findings of a jury. *Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 204 (Tenn. Ct. App. 2013). When the factual foundation of a jury verdict is challenged on appeal, it will only be set aside when there is no material evidence to support it. Tenn. R. App. P. 13(d). Nevertheless, we review the trial court's conclusions of law de novo with no presumption of correctness. *See Elchlepp v. Hatfield*, 294 S.W.3d 146, 149 (Tenn. Ct. App. 2008).

The Contestants challenge a number of the trial court's discretionary decisions. On appeal, a trial court's discretionary decisions are analyzed using the abuse of discretion standard of review. *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). In reviewing a trial court's discretionary decisions, the "appellate courts should begin with the presumption that the decision is correct and should review the evidence in the light most favorable to the decision." *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999). The decision "will be upheld so long as reasonable minds can disagree as to propriety of the decision made." *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). That deferential standard reflects awareness that the decision being reviewed involved a choice among several acceptable alternatives and therefore envisions a less rigorous review of the decision and a decreased likelihood that it will be reversed on appeal. *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010). A trial court's decision will only be reversed under an abuse of discretion standard "when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc.*, 312 S.W.3d at 524.

## IV. DISCUSSION

When a testator dies, the person nominated by the testator's will to serve as executor of the estate has a duty to institute legal proceedings to probate the will. *In re Estate of Boote*, 198 S.W.3d 699, 711 (Tenn. Ct. App. 2005). Thereafter, any person who claims an interest in the testator's estate has a right to contest the validity of the will and to demand a jury trial on disputed questions of fact. *Id*. at 713 (citing Tenn. Code Ann. § 32-4-107(a)). The primary issue in a will contest is generally whether the paper writing offered for probate is the testator's valid last will and testament. *Id*.

Due to their unique nature, courts use presumptions to shift the burden of proof in will contest proceedings. Initially, the proponent of the contested will has the burden of presenting proof that the will was executed in compliance with all of the formalities of law. *In re Estate of Eden*, 99 S.W.3d 82, 88 (Tenn. Ct. App. 1995). When the contested will is a written document with subscribing witnesses, it must be proved by all living witnesses, "if to be found." Tenn. Code Ann. § 32-4-105 (2015). Once the proponent presents proof showing that the will was executed in compliance with the legal formalities, the will is presumed to be valid, and the burden shifts to the contestant to demonstrate that the will is invalid for some reason. *In re Estate of Eden*, 99 S.W.3d at 88.

While the Contestants challenged the validity of Ms. Link's 1998 will on several grounds at trial, the one most pertinent to the issues they raise on appeal is undue influence. Undue influence is characterized as coercive conduct aimed at destroying the testator's free agency to such an extent that the stronger will of the proponent overcame the will of the testator. *See Keasler v. Estate of Keasler*, 973 S.W.2d 213, 220 (Tenn. Ct. App. 1997) (quoting *Hammond v. Union Planters Nat'l Bank*, 222 S.W.2d 377, 383-84 (Tenn. 1949)). Because direct evidence of undue influence is rare, the contestants in most cases must establish undue influence by proving the existence of suspicious circumstances that support a conclusion that the will's execution was not the product of the testator's free and independent act. *Kelley v. Johns*, 96 S.W.3d 189, 195 (Tenn. Ct. App. 2002). The suspicious circumstances most frequently relied on in will contests are (1) a confidential relationship between the testator and the beneficiary, (2) the testator's poor physical or mental health, and (3) the beneficiary's involvement in the procurement of the will.[4] *Id*. at 196. Although there is no prescribed type or number of suspicious circumstances necessary to invalidate a will, the doctrine of undue influence is only applicable in Tennessee when it is shown that the person alleged to have exercised undue influence on the testator was in a confidential relationship with the testator.[5] *In re Estate of Brevard*, 213 S.W.3d 298, 302 (Tenn. Ct. App. 2006).

A confidential relationship is any relationship that gives one person dominion and control over another. *Kelley*, 96 S.W.3d at 197. Confidential relationships can assume a variety of forms, and the courts have generally been reluctant to define what constitutes a confidential relationship. *Id*. Nevertheless, courts have identified several types of relationships that are confidential as a matter of law. *Id*. In *Mitchell v. Smith*, 779

---

[4] Other recognized suspicious circumstances are (1) secrecy concerning the will's existence, (2) the testator's advanced age, (3) the lack of independent advice in procuring the will, (4) the testator's illiteracy or blindness, (5) the unjust or unnatural terms of the will, (6) the testator being in an emotionally distraught state, (7) discrepancies between the will and testator's expressed intentions, and (8) fraud or duress directed toward the testator. *Kelley*, 96 S.W.3d at 196.

[5] Such a confidential relationship need not involve the beneficiary, as undue influence may be exercised by someone other than a beneficiary. *DeLapp v. Pratt*, 152 S.W.3d 530, 542 (Tenn. Ct. App. 2004).

S.W.2d 384, 388 (Tenn. Ct. App. 1989), this Court held that a person authorized to act on behalf of another by virtue of an unrestricted power of attorney has a confidential relationship as a matter of law with the person who executed the power of attorney. Initially, the Tennessee Supreme Court expressed its agreement with that rule in *Matlock v. Simpson*, 302 S.W.2d 384, 386 (Tenn. 1995). Later, however, in *Childress v. Currie*, 74 S.W.3d 324, 329 (Tenn. 2002), the Tennessee Supreme Court clarified that an unexercised power of attorney does not create a confidential relationship. Thus, Tennessee case law currently provides that a confidential relationship arises as a matter of law when an unrestricted power of attorney is granted in favor of the dominant party and is, in fact, exercised by the dominant party.[6] *See, e.g.*, *Mitchell v. Morris*, No. E2015-01353-COA-R3-CV, 2016 WL 890212, at *6 (Tenn. Ct. App. Jan. 6, 2016).

A confidential relationship followed by a transaction in which the dominant party receives a benefit from the other party creates a presumption of undue influence. *In re Estate of Price*, 273 S.W.3d 113, 125 (Tenn. Ct. App. 2008). The proponent may rebut the presumption by presenting clear and convincing evidence of the fairness of the transaction. *Id.* As it is used in this context, however, the term "fairness" is not meant to suggest an inquiry into whether the person benefitting from the will deserved what the will provided. *Matter of Estate of Depriest*, 733 S.W.2d 74, 79 (Tenn. Ct. App. 1986). "A person may make a legally effective disposition of his estate which reasonable men would regard as unfair." *In re Reddaway's Estate*, 329 P.2d 886, 892 (Or. 1958). Instead, the inquiry is limited to a determination of the testator's capacity to make a will and whether the provisions of the will were arrived at through the testator's free agency. *Id.* Oftentimes, the fairness of a contested will is demonstrated by presenting evidence that the testator received independent advice in preparing the will. *In re Estate of Maddox*, 60 S.W.3d 84, 89 (Tenn. Ct. App. 2001).

---

[6] In *In re Conservatorship of Groves*, 109 S.W.3d 317, 352 (Tenn. Ct. App. 2003), this Court cited *Childress* in stating, "[a] general power of attorney is not necessarily evidence of a confidential relationship as long as the person receiving the power of attorney was not active in its procurement and has not exercised it." The Contestants interpret that statement as providing that a general power of attorney, even if it is not exercised, creates a confidential relationship as a matter of law if the attorney-in-fact was active in procuring it. However, this Court's cases citing *Groves* have consistently interpreted it to mean that a confidential relationship exists as a matter of law when the attorney-in-fact was active in procuring a general power of attorney *and* has exercised it. *See Malek v. Gunter*, No. M2009-00059-COA-R3-CV, 2009 WL 4878613, at *6 (Tenn. Ct. App. Dec. 16, 2009); *Cataldo v. Stanley*, No. M2008-02430-COA-R3-CV, 2009 WL 3074620, at *6 (Tenn. Ct. App. Sept. 25, 2009); *Dickson v. Long*, No. M2008-00279-COA-R3-CV, 2009 WL 961784, at *9 (Tenn. Ct. App. Apr. 8, 2009); *Waller v. Evans*, No. M2008-00312-COA-R3-CV, 2009 WL 723519, at *8 (Tenn. Ct. App. Mar. 17, 2009).

## A. Summary Judgment and Judgment Notwithstanding the Verdict

The Contestants argue that the trial court erred in denying their pre-trial motion for summary judgment. Summary judgment is a procedural mechanism for avoiding the time and expense of trial by concluding cases that can be resolved on dispositive legal issues alone. *See Messer Grieshiem Indus. v. Cryotech of Kingsport, Inc.*, 45 S.W.3d 588, 608 (Tenn. Ct. App. 2001). When a trial court denies a motion for summary judgment based on the existence of disputed material facts, the denial is not appealable after a trial on the merits. *In re Estate of Blackburn*, 253 S.W.3d 603, 611 (Tenn. Ct. App. 2007). In this case, the trial court denied the Contestants' summary judgment motion based on the existence of disputed material facts, and the case proceeded to a full jury trial on the merits. As such, the trial court's denial of summary judgment is not reviewable on appeal, and we decline to address it.

The Contestants also argue that the trial court erred in denying their post-judgment motion for a judgment notwithstanding the verdict. Although the term is not used in the rule, Tennessee Rule of Civil Procedure 50.02 provides a procedure for what is commonly referred to as a judgment notwithstanding the verdict. Robert Banks, Jr. & June F. Entman, *Tennessee Civil Procedure* § 12-1(c) (4th ed. 2015). Technically, the rule permits a trial judge to take a motion for a directed verdict under advisement without granting or denying it at trial and allows the moving party to request a ruling on the motion after the jury has returned its verdict. *Id.* As such, a party seeking a judgment notwithstanding the verdict based on the legal insufficiency of the opposing party's evidence must have moved for a directed verdict before the case was submitted to the jury. Tenn. R. Civ. P. 50.02; *Potter v. Tucker*, 688 S.W.2d 833, 835 (Tenn. Ct. App. 1985). In this case, the Contestants did not move for a directed verdict before the case was submitted to the jury. The trial court's denial of their motion for a judgment notwithstanding the verdict was therefore appropriate.

## B. Errors Affecting the Jury's Verdict

The Contestants raise a number of issues related to the trial court's control over the course of the trial and witness examination. They argue that, taken together, those errors contributed to juror confusion and affected the jury's verdict. Trial judges have broad discretion in controlling the course and conduct of a trial. *Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 420 n.7 (Tenn. Ct. App. 2013). That discretion necessarily extends to their determinations regarding the scope and manner of witness examination. *Id.* As such, we review these issues using the deferential abuse of discretion standard. *See Lee Med., Inc.*, 312 S.W.3d at 524.

The Contestants argue that the trial court erred in failing to deem undisputed facts established at trial pursuant to Tennessee Rule of Civil Procedure 56.05. Rule 56.05 provides that upon denial of a summary judgment motion, the trial court "shall if practicable" ascertain what material facts are undisputed and deem them established at trial. Tenn. R. Civ. P. 56.05. Although the Contestants argue that the trial court's failure to deem undisputed material facts established at trial contributed to juror confusion and affected the jury's verdict, they do not indicate what specific facts the trial court should have deemed established. Rather, they make ambiguous references to "undisputed facts showing that Appellee was active in procuring the power of attorney," and "undisputed facts establishing dominion and control." Additionally, they do not explain how the trial court's failure to designate these unspecified, undisputed facts led to juror confusion. We find no abuse of discretion on this issue.

The Contestants argue that the trial court further contributed to juror confusion and affected the jury's verdict when it "impeded [the Contestants'] examination of witnesses and ignored abuse by [Mr. Layne's] counsel." In support of their argument, they cite, largely without explanation, a number of rulings, statements, and other occurrences from the trial. For example, they cite the trial judge's decision to rule on the admissibility of Mr. Kelly's handwritten notes after both parties presented their cases-in-chief, but they do not explain how it was improper or prejudicial in light of the fact that the notes were only relevant as rebuttal evidence. Likewise, they cite the trial judge's decision to let Ms. Kelly identify Mr. Kelly's signature on Ms. Link's 1998 will during her initial testimony but do not explain how it was prejudicial in light of the fact that Ms. Murphy and Ms. Steele also identified Mr. Kelly's signature on the will. The Contestants cite instances in which the trial judge instructed their attorneys, in front of the jury, not to argue with a witness, not to display documents before introducing them into evidence, and not to summarize witness testimony, but they do not assert that those instructions were improper. They cite an instance in which the judge admonished one of their attorneys for accusing a witness of lying. They fail to mention, however, that the occurrence took place outside of the jury's presence. They cite two of their own objections that were overruled, but they do not explain that the rulings were improper or prejudicial. They also cite 27 of Mr. Layne's objections–16 that were sustained, 7 that were overruled, and 4 that were not ruled on–with little or no explanation of their significance. They cite four leading questions asked by Mr. Layne's attorney at trial but decline to mention that they did not object to three of them and that Mr. Layne's attorney rephrased the fourth. They point out that photocopies, rather than originals, of certain documents were admitted into evidence without explaining the relevance of that fact.

While it appears that the Contestants have taken inventory of every minor disruption and distraction that occurred throughout the trial, we are not inclined to infer their significance on our own. The Contestants have not demonstrated that the trial

- 14 -

court's control over the course of the trial and witness examination caused an injustice to them. Thus, having perhaps given the foregoing issues more attention than they deserve, we conclude that they do not, separately or collectively, warrant reversal.

## C. Evidentiary Rulings

The Contestants also challenge a number of the trial court's evidentiary rulings. Decisions regarding the admissibility of evidence are within the sound discretion of the trial court and are therefore reviewed using the abuse of discretion standard. *Shipley v. Williams*, 350 S.W.3d 527, 552 (Tenn. 2011). Moreover, an erroneous evidentiary ruling does not require reversal unless it affects a substantial right of the complaining party. *Brandy Hills Estates, LLC v. Reeves*, 237 S.W.3d 307, 318 (Tenn. Ct. App. 2006).

### *Ms. Kelly & the Handwritten Notes*

The Contestants argue that the trial court erred in allowing Ms. Kelly to testify and in admitting Mr. Kelly's handwritten notes because they were not timely disclosed in compliance with the trial court's scheduling order and Rule 11.01 of the Twelfth Judicial District Local Rules.[7] We agree that Mr. Layne's disclosure of Ms. Kelly and the handwritten notes on the eve of trial violated the time limits set forth in the scheduling order and local rules. However, trial judges have the discretion to extend the application of such time limits. *See* Tenn. R. Civ. P. 6.02; *see also Williams v. Baptist Mem'l Hosp.*, 193 S.W.3d 545, 551 (Tenn. 2006) ("[T]he terms of Rule 6.02, dictate that whether to grant an enlargement of time is left to the discretion of the trial court."). Mr. Layne's attorney represented to the trial court that he contacted opposing counsel immediately after Ms. Kelly told him the severity of Mr. Kelly's condition and of the handwritten notes. Nothing in the record suggests that those representations were not true and Ms. Kelly corroborated them in her testimony. Because Tennessee law requires contested wills to be proved by all available living witnesses, Mr. Layne had to present some satisfactory evidence that Mr. Kelly was not available or able to testify or lose the case on a technicality. To avoid that harsh result, the trial court allowed Ms. Kelly to testify initially regarding Mr. Kelly's availability. In our view, the only harm that decision caused the Contestants was that it required them to resolve the case on the merits. Such a decision can hardly be considered an abuse of discretion. The trial court reserved ruling on the admissibility of Mr. Kelly's handwritten notes until after an evidentiary hearing. The Contestants suggest that the late disclosure of the handwritten notes casts doubt on their authenticity but provide no additional evidentiary support for that assertion. Ms. Kelly and Ms. Murphy both identified the handwriting in the notes as Mr. Kelly's

---

[7] Rule 11.01 of the Twelfth Judicial District Local Rules requires that witnesses and exhibits be disclosed 72 hours prior to trial.

handwriting. Ms. Kelly testified that Mr. Kelly suffered a stroke in 2011 that severely affected his ability to write and her testimony was subjected to cross examination by Contestants' counsel. While it is possible that the notes were fabricated on the eve of trial, the probative evidence in the record suggests that they are authentic. In any event, neither party attempted to depose Mr. Kelly or obtain a subpoena for his files despite the fact that they both anticipated that he would be called as a witness. Had they done so, the severity of his condition and the existence of the handwritten notes likely would have been discovered much earlier. As it happened, the trial court was faced with a decision between withholding relevant evidence from the jury to Mr. Layne's detriment or excusing the untimely disclosure and allowing the jury to consider all of the relevant evidence. Given the circumstances, we believe that choosing either option would have been acceptable. When a decision reflects a choice between two acceptable alternatives, we are not permitted to substitute our judgment for that of the trial court. We therefore find no abuse of discretion in the trial court's decision.

### Ms. Link's 1998 Will

Notwithstanding their argument that Ms. Kelly should not have been allowed to testify, the Contestants argue that the trial court erred in admitting Ms. Link's 1998 will because Ms. Kelly's testimony failed to establish that Mr. Kelly was not available to testify.

Tennessee law requires the proponent of a contested will to present the testimony of all living witnesses to the will's execution or demonstrate that they are not available. *Swindoll v. Jones*, 292 S.W.2d 531, 541 (Tenn. Ct. App. 1954). It is the trial judge's function to determine whether the proponent of the will has complied with that requirement. *Id.* A trial court's decision regarding the availability of a living witness to a contested will is discretionary. *Id.*

The Contestants argue that Ms. Kelly's testimony regarding Mr. Kelly's ability to communicate was inconsistent and therefore insufficient to establish that he was not available. They cite various portions of Ms. Kelly's testimony in support of that assertion. For example, during direct examination Ms. Kelly stated that Mr. Kelly's "ability to produce the words, even in writing the ability to produce the words is not there." Later, however, she testified that "I know pretty much most of the time what he wanted to say," and that "now he has to write with his left hand." While these statements may seem inconsistent standing on their own, they are not in the full context of Ms. Kelly's testimony. Ms. Kelly testified that Mr. Kelly has the ability to form short words, such as "yes" and "no," but cannot use them consistently to communicate what he actually means. For example, when asked if he would like a drink, he might respond by saying "yes," but upon receiving the drink, might reject it. She testified that Mr. Kelly

struggled similarly with written communication. She explained that the stroke left Mr. Kelly, who had been right-handed previously, paralyzed on his right side. She later testified that he had improved signing his name with his left hand but usually could not write complete words. Read as a whole, Ms. Kelly's testimony reflects, quite clearly, that Mr. Kelly cannot consistently produce the words he intends to produce. Particularly as it relates to testifying in front of a jury, a person's ability to produce words is essentially useless if their words do not convey the intended information.

The Contestants also argue that, even if Ms. Kelly's testimony sufficiently established that Mr. Kelly could not communicate verbally or in writing, it did not establish that he was unable to comprehend questions posed to him. They assert that Mr. Kelly could have therefore been physically present in the courtroom and answered questions posed to him using physical gestures. This argument requires little discussion. To require a partially paralyzed individual with severely deficient motor skills to appear in front of a jury for the sole purpose of using physical gestures to confirm the validity of a document when there is no contravening evidence that the document is invalid and multiple other individuals have confirmed its validity would be an exercise in futility and perhaps even abuse. We decline to countenance such an exercise. The trial court, having heard the testimony and observed the witnesses, found that Mr. Kelly was not available to testify, and we are satisfied that the record supports its determination. We therefore conclude that the trial court did not err in admitting Ms. Link's 1998 will.

### Other Evidentiary Arguments

The Contestants raise numerous other challenges to the trial court's evidentiary rulings. We will address each in turn beginning with their assertion that the trial court erred in allowing evidence of Ms. Link's nursing home expenses and the value of her estate to be admitted at trial. The record reflects that Mr. Layne testified regarding the cost of Ms. Link's nursing home expenses and the Contestants did not object to it. That issue is therefore waived. *See Barnes v. Barnes*, 193 S.W.3d 495, 501 (Tenn. 2006). In their brief, the Contestants state, "the value of Ms. Link's estate was undisputed and should not have been reduced to any amount, so this evidence and argument misled the jury." The record reflects, however, that *the Contestants' attorney* asked Reed Durham, "And did Ms. Link die with a good bit of money for Jasper, Tennessee standards?" Later, *the Contestants' attorney* asked Mr. Layne, "How much money did Ms. Link die with?" and *Mr. Layne's attorney* objected. Indeed, the only statement to the jury regarding the specific value of Ms. Link's estate was that of *the Contestants' attorney* in closing arguments that, "[Mr. Layne is] getting everything but $10,000 of a $750,000 estate." This argument has no merit.

Next, the Contestants argue that the trial court erred in excluding evidence related to the estate of Nora Rogers. Ms. Rogers was another one of Mr. Layne's aunts. During a deposition, Mr. Layne acknowledged that he was the sole beneficiary of Ms. Rogers's will. Before trial, Mr. Layne filed a motion to exclude evidence related to Ms. Rogers and her will. The trial court denied the motion and ordered Mr. Layne to bring Ms. Rogers's will to trial if it was still in existence. At trial, Mr. Layne testified that he could not find the will and was sure that it had been destroyed. The trial judge then instructed the Contestants' attorneys not to question Mr. Layne any further about the disposition of Ms. Rogers's estate. The Contestants argue that they should have been allowed to continue questioning Mr. Layne about Ms. Rogers to demonstrate his *modus operandi*. Standing alone, however, the fact that Mr. Layne was the sole beneficiary of another relative's will has little relevance in this case. We find no abuse of discretion on this issue.

The Contestants also argue that the trial court erred in excluding evidence that Ms. Link transferred silverware to Mr. Layne during her lifetime. During a deposition, Mr. Layne acknowledged that Ms. Link gave him a set of silverware sometime between 1998 and 2007. Mr. Layne filed a motion to exclude evidence of the transfer, as it would not be relevant in determining the validity of Ms. Link's 1998 will. The trial court granted the motion. The Contestants argue that the trial court erred in excluding evidence of the silverware transfer because it occurred after Ms. Link executed a power of attorney in favor of Mr. Layne giving rise to a presumption that it was procured through undue influence. This argument has no merit. The Contestants' amended complaint contests only the validity of Ms. Link's 1998 will; it does not contest the silverware transfer. As such, we conclude that the trial court did not abuse its discretion in excluding that evidence.

Finally, the Contestants argue that the trial court erred in excluding evidence of an inappropriate personal relationship between two witnesses to the execution of Ms. Link's 1998 will. At trial, the Contestants' attorney attempted to elicit testimony on that subject. Mr. Layne's attorney objected, and the judge ruled that the evidence was not relevant. Nevertheless, the judge permitted the Contestants' attorney to continue the line of questioning outside the jury's presence. The Contestants argue that the evidence should have been presented to the jury because subscribing witnesses to a will's execution who are engaged in an inappropriate relationship might be willing to compromise their usual execution procedures. Even if that were true, however, the testimony elicited outside the jury's presence reflects that the relationship in question did not begin until October 1998– months after Ms. Link's will was executed. We therefore conclude that the trial court did not abuse its discretion in excluding the evidence.

## D. Jury Instructions & Verdict Form

The Contestants raise a number of challenges to the trial court's jury instructions and verdict form. Specifically, they contend that trial court erred by (1) rejecting their requested jury instructions, (2) delivering an inaccurate instruction on forgery, (3) delivering an inaccurate instruction on undue influence, (4) failing to instruct the jury regarding missing evidence, (5) calling the jury's attention to inadmissible evidence, and (6) using a general verdict form. We will address each of these issues in turn.

Will contests are often surrounded by confusion and uncertainty, and the trial court's instructions are the only proper source of legal principles to guide the jury in their deliberations. *In re Estate of Eden*, 99 S.W.3d at 91. Although we give the trial courts leeway regarding the substance of their instructions, the instructions should be substantially accurate statements of the law applicable to the issues the jury must decide. *Id.* Determining the scope and substance of the jury instructions requires consideration of the parties' theories, the evidence presented, and the applicable law. *Id.* The instructions are not measured against a standard of perfection, as long as they fairly define the legal issues involved in the case and do not mislead the jury. *Brandy Hills Estate, LLC*, 237 S.W.3d at 319. When reviewing a trial court's jury instructions on appeal, we review the entire charge, just as the jury would, in order to determine whether the trial judge committed a prejudicial error. *Id.* We may consider the jury instructions in conjunction with the verdict form in determining whether the issues were presented to the jury in a clear and fair manner. *Payne v. CSX Tansp., Inc.*, 467 S.W.3d 413, 446 (Tenn. 2015).

### *Requested Jury Instructions*

The Contestants argue that the trial court erred in rejecting their requested jury instructions because the parties could not agree to jury instructions before trial. When a special instruction is requested that is not included in the general charge and is supported by the evidence introduced at trial, the trial court should give the instruction. *Johnson v. Tenn. Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 372 (Tenn. 2006). However, reversal is only appropriate when the improper denial of requested instructions has prejudiced the rights of the requesting party. *Id.* In this case, both parties submitted proposed jury instructions to the trial court prior to trial. During a pre-trial conference, the trial judge noted "a significant amount of difference" between the parties' proposed instructions and directed the attorneys to work together to come up with one set of instructions. Later, when the attorneys represented to the judge that they had not been able to reach an agreement, the judge indicated that he would instruct the jury using the Tennessee Pattern Jury Instructions. We discern no reversible error in the trial court's decision. As we explain in greater detail below, the trial court's jury instructions were substantially

accurate statements of the applicable law. We therefore discern no prejudice in the trial court's decision.

### *Forgery Instruction*

The Contestants argue that the trial court delivered an inaccurate jury instruction on forgery. The trial court instructed the jury that the Contestants had the burden of establishing that the signatures or markings on Ms. Link's 1998 will were forgeries. The Contestants argue that the trial court should have instructed the jury on the manner in which evidence that suggests a contested will has been altered shifts the burden of proof to the will's proponent to demonstrate that the will is valid. As we explained above, proof of due execution generally creates a presumption that a contested will is valid, and the burden shifts to the contestant to demonstrate that the will is invalid. *In re Estate of Eden, 99 S.W.3d at 88.* In *Haynes v. Mullins*, 209 S.W.2d 278, 279 (Tenn. Ct. App. 1947), however, this Court held that when "the physical condition of the paper offered for probate is such as to excite suspicion," the burden remains on the proponent to dispel the suspicious circumstances surrounding its execution. In *Haynes*, there was evidence that the names of the subscribing witnesses were added to the contested will after it was submitted to probate and that the testator's signature and the name of notary had been traced. *Id*. at 279-80. As such, the court held that the burden of proof remained on the will's proponent to remove the suspicion of forgery by showing that the alterations were not material or were made in good faith. *Id*. at 279. The Contestants assert that multiple sets of staple holes in Ms. Link's 1998 will, a misspelling of Ms. Link's name in the attached affidavit, and the fact that Article II of the will has a subsection "A" and no subsection "B" are similar indicators of forgery such that the burden of proof remained on Mr. Layne to remove the suspicion that Ms. Link's 1998 will was forged. We disagree. None of those features "excites suspicion" that the will was forged or altered. Accordingly, we are satisfied that the trial court's jury instruction on forgery was accurate.

### *Undue Influence Instruction*

The Contestants argue that the trial court delivered an inaccurate jury instruction on undue influence. The trial court's jury instruction on undue influence largely tracked Tennessee Pattern Jury Instruction–Civil 11.39 ("TPI 11.39"). While the Tennessee Pattern Jury Instructions are a valuable resource for trial courts, they do not have the force of law and are subject to objection and reversal like all other jury instructions. *See Matlock*, 902 S.W.2d at 386 (rejecting Tennessee Pattern Jury Instruction–Civil 11.60). The Contestants submit that the trial court's jury instruction on undue influence was inconsistent with Tennessee law for several reasons.

First, the Contestants argue that the trial court's instruction was inaccurate because it misstated the evidence required to create a presumption of undue influence. Tennessee courts have held that "a presumption of undue influence arises when there is a confidential relationship followed by a transaction in which the dominant party receives a benefit from the other party." *See, e.g.*, *In re Estate of Price*, 273 S.W.3d at 125. Here, the trial court instructed the jury a presumption of undue influence would arise if they found that Mr. Layne had a confidential relationship with Ms. Link, "was active in causing the will to be made, and *unduly* profited from it."[8] The Contestants argue that the trial court's instruction placed an excessively high burden on them in establishing a presumption of undue influence. We disagree. Requiring the party contesting a will to show that the proponent was "active in causing the will to be made" in order to create a presumption of undue influence is a substantially accurate statement of the law. As we explained above, undue influence, at its core, contemplates some coercive conduct aimed at destroying the testator's free agency to such an extent that the stronger will of the proponent overcomes the will of the testator. *Keasler*, 973 S.W.2d at 220. It is therefore obvious that the proponent must have played a role in causing the will to be made in order for a presumption that they procured it through undue influence to arise. Were that not the case, undue influence would be presumed anytime a testator devised property to a person with whom they shared a confidential relationship, even when it was undisputed that the dominant party was not involved in causing the will to be made. Such a rule would defy logic and undermine the core definition of undue influence. Likewise, requiring the party contesting a will to show that the proponent has "unduly profited" from the will is a substantially accurate statement of the law. There is no meaningful distinction between the words "profit," as used by the trial court, and "benefited," as used in the cases cited by the Contestants. The trial court's insertion of the word "unduly" does little to affect the instruction's overall meaning. The ultimate issue is, after all, whether the proponent exerted *undue* influence over the testator in causing the will to be made. If a person exercised undue influence to obtain some profit or benefit that was rightfully due them, there would be little basis for invalidating the transaction.

Next, the Contestants argue that the trial court's instruction was inaccurate because it did not accurately define a confidential relationship that arises as a matter of law. Specifically, they argue that the trial court's instruction precluded the jury from finding a confidential relationship existed between Mr. Layne and Ms. Link unless it determined that Mr. Layne exercised his power of attorney prior to the execution of Ms. Link's 1998 will. As we explained previously, confidential relationships can assume a variety of forms, and the courts have generally been reluctant to define what constitutes a

---

[8] The trial court's instruction differed slightly from TPI 11.39, which provides that a presumption of undue influence arises when there is a confidential relationship and the proponent "was active in causing the will to be made and benefitted from it."

confidential relationship. *Kelley*, 96 S.W.3d at 197. Nevertheless, a confidential relationship may arise as a matter of law when an unrestricted power of attorney is executed in favor of and exercised by the dominant party prior to the will's execution. *Childress*, 74 S.W.3d at 329. Here, the trial court instructed the jury, "[a] confidential relationship arises as a matter of law when an unrestricted Power of Attorney is granted to the dominant party and is in fact exercised and used." However, the trial court also stated, "[a] confidential relationship exists whenever the trust and confidence of one person is placed in the honesty and faithfulness of another." The instruction was therefore broad enough that it allowed the jury to consider any number of factors in determining whether a confidential relationship existed between Mr. Layne and Ms. Link.

Next, the Contestants argue that the trial court's instruction was inaccurate because it did not accurately instruct the jury on the manner in which the proponent of a will can rebut a presumption of undue influence. They contend that the trial court should have instructed the jury that a presumption of undue influence may be overcome by clear and convincing evidence of the transaction's fairness. As the Contestants point out, many Tennessee cases provide that the presumption of undue influence may be overcome by clear and convincing evidence of the fairness of the transaction. *See, e.g.*, *In re Estate of Maddox*, 60 S.W.3d at 89. Here, the trial court instructed the jury that the presumption of undue influence "may be overcome if the proponent proves by clear and convincing evidence that the making of the will was not the result of undue influence." The trial court did not instruct the jury to consider the "fairness of the transaction." As we alluded to previously, however, using the term "fairness" in a jury instruction can be problematic because of the possibility that the jury may associate it with the testator's moral duty to provide for certain individuals:

> Without the term being carefully defined the average jury might assume that it was being asked to find whether the person benefitting from the will deserved what the will provided. That is not the meaning of the term. The jury should not be concerned with the question of whether the testator did right by those who ordinarily would be the objects of the testator's bounty. The jury's function is limited to a determination of the testator's capacity to make a will and whether the provisions in the will were arrived at through the free agency of the testator rather than through the imposition of someone else's will. If the jury finds in favor of the will on these two questions it has found that the transaction was fair.

*In re Matter of Depriest*, 733 S.W.2d at 79. Given the risk of juror confusion associated with the term, the trial court's omission of the word "fairness" from its instruction does not constitute a reversible error. The trial court's instruction was a substantially accurate statement of the law. It was therefore sufficient and will not be disturbed.

*Missing Evidence Instruction*

The Contestants argue that the trial court erred in failing to give an instruction on missing evidence. When a party fails to produce evidence capable of shedding light on a contested issue, the opposing party may be entitled to an instruction that the jury is permitted to infer that the missing evidence would have been unfavorable to the party possessing it. *See Richardson v. Miller*, 44 S.W.3d 1, 27-28 (Tenn. Ct. App. 2000).

When the missing evidence is a document, the party seeking a missing evidence instruction must demonstrate that the document existed and was in its adversary's exclusive control and that the party possessing the document could have produced it. *Id.* at 28. The Contestants argue that a missing evidence instruction was warranted in this case because Mr. Layne destroyed numerous documents that were relevant to the litigation over which he had exclusive control and did so without providing a reasonable explanation. In support of that assertion, they cite Mr. Layne's failure to produce Ms. Link's genealogy records, master's thesis, driver's license, marriage license, recipe books, vehicle registration, as well as certain bank records and income tax returns that they assert would have been in Ms. Link's house or safe deposit box. They also cite his failure to produce Ms. Rogers's will. Many of those documents bear little, if any, relevance to this litigation. Furthermore, there is nothing, beyond the pure speculation of the Contestants, to suggest that any of the aforementioned documents were ever in Mr. Layne's exclusive control during the pendency of these proceedings. The Contestants also cite Mr. Layne's failure to produce documents showing who scheduled Ms. Link's appointments with Mr. Kelly or who paid Mr. Kelly to draft Ms. Link's 1998 will. However, there is no evidence such documents exist or have ever been in Mr. Layne's possession. As such, we are satisfied that no missing evidence instruction was necessary in this case.

*Inadmissible Evidence*

The Contestants argue that the trial court's jury instructions drew attention to inadmissible evidence. In addition to Mr. Kelly's handwritten notes, Ms. Kelly also produced a 1996 will executed by Ms. Link from Mr. Kelly's files on the eve of trial. The trial court admitted the handwritten notes but excluded the 1996 will. In an effort to keep the jury from considering the 1996 will, the trial judge ordered that references to the 1996 will be redacted from the 1998 notes. When trial resumed the following day, the Contestants' attorney asked Ms. Kelly whether there was a copy of Ms. Link's 1989 will in Mr. Kelly's files, and she responded, "No. There was a 1996 will in there." After the close of proof, Mr. Layne's attorney requested that the court give a special instruction regarding the redaction in the handwritten notes. The trial judge informed the jury that the redaction was made at his direction and they should not think the notes were altered

by one of the parties. We fail to see how that instruction was impermissible or inappropriate. While the Contestants argue that Ms. Kelly's reference to the 1996 will gave them the right to request a curative instruction directing the jury not to consider inadmissible evidence for any purpose, the record does not reflect that they ever requested such an instruction. As such, we find no error on the part of the trial court.

### *Verdict Form*

Finally, the Contestants argue that the trial court's verdict form caused juror confusion and affected the jury's verdict. Trial courts have wide discretion in tailoring the questions on a verdict form to meet the needs of each unique case. *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 910 (Tenn. Ct. App. 1999). When a party advances multiple theories of relief, common sense principles should guide the attorneys and the judge in preparing both the jury instructions and the verdict form. *Id*. Verdict forms should use the same terms as those used in the jury instructions and should repeat and highlight important issues discussed in the instructions. *Id*. A new trial is warranted when a verdict form does not address each theory of relief and allow the jury to respond to them adequately. *Id*. at 911. Even when a verdict form is defective, the jury's verdict will be upheld as long as it sufficiently defines the issues in such a way as to enable the court to intelligently articulate a judgment. *Id*. Here, the interrogatories listed on the verdict form and the jury's answers to the interrogatories were:

1. Do you find that Gertrude Bible Link had the testamentary capacity to execute the contested will?
   __X__ YES
   _____ NO

2. Did Gertrude Bible Link have the testamentary intent to execute the contested will?
   __X__ YES
   _____ NO

3. Do you find that the contested will was forged?
   _____ YES
   __X__ NO

4. Do you find that the contested will was the product of undue influence?
   _____ YES
   __X__ NO

5. Do you find that the contested will was the product of fraud?

_____YES
__X__ NO

6. Do you find that the instrument executed on March 11, 1998 to be the valid, executed Last Will and Testament of Gertrude Bible Link?
__X__YES
_____NO

Thus, the jury answered a series of interrogatories or questions related to each of the theories advanced by the Contestants and a final interrogatory regarding the validity of Ms. Link's 1998 will. The jury's responses are not inconsistent, and there is nothing to suggest that the verdict form was confusing. The Contestants assert that the trial court's instructions did not adequately define terms used in the verdict form, such as "testamentary capacity" and "testamentary intent." That assertion is not supported by the record. The trial court's instructions used both terms multiple times and explained both the mental capacity necessary to execute a will and that the contested document must reflect that it is, in fact, the testator's will. Based on the foregoing, we do not find error in the verdict form submitted to the jury by the trial court.

### E. Supplemental Instruction & *Ex Parte* Communications

The Contestants argue that the trial judge erred in delivering a "dynamite charge" that emphasized the time and money the parties invested in trying the case and that it affected the jury's verdict. The "dynamite charge" is a supplemental jury instruction that gained national prominence following the United States Supreme Court's opinion in *Allen v. United States*, 164 U.S. 492, 501-502 (1896), which upheld, in a criminal case, a jury instruction encouraging dissenting jurors to consider whether their doubt was reasonable when the majority of jurors were for conviction. In the years that followed, however, both federal and state courts widely criticized *Allen* for suggesting that minority members of a jury should surrender their convictions to the majority. *See, e.g.*, *U.S. v. Fioravanti*, 412 F.2d 407, 420 (3d Cir. 1969) ("Hereafter, in this circuit, trial judges are not to give instructions . . . that direct a juror to distrust his own judgment if he finds a large majority of the jurors taking a view different from his."); *State v. Randall*, 353 P.2d 1054, 1058 (Mont. 1960) ("The inevitable effect of the instruction would be to suggest to the minority members of the jury that they ought to surrender their own convictions and follow the majority."). In 1975, the Tennessee Supreme Court added our state to the list of jurisdictions rejecting *Allen* with its opinion in *Kersey v. State*, 525 S.W.2d 139 (Tenn. 1975) ("We view these charges as being tantamount to a judicially mandated majority verdict which is impermissible under Tennessee law."). In doing so, the *Kersey* Court also set forth a pattern instruction to be used as part of any supplemental instruction in the

event of an impasse in the deliberations of the jury.  *Id*. at 145.  The Court declared that variations from the following form were impermissible:

> The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

> It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment.  Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.  In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous.  But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

*Id*. at 145.[9]  In 1978, the Tennessee Supreme Court held that its opinion in *Kersey* extended to civil cases.  *Vanderbilt Univ. v. Steely*, 566 S.W.2d 853 (Tenn. 1978).  In doing so, the Court was particularly critical of supplemental instructions that place an emphasis on the time, money, and effort that a new trial would require.  *Id*. at 854.

In this case, several hours after the jury was excused for deliberations, the trial judge informed the parties' attorneys that the jury did not expect to reach a verdict and that some of the jurors would not be able to return the following day.  He told the attorneys that, in an effort to avoid a mistrial, he could give the jury "a little dynamite charge" to explain the importance of their role.  Although the judge stated that he did not have a prepared supplemental instruction, neither party objected.  The jury returned to the courtroom, and the judge gave them the following supplemental instruction:

> What I want to say to you is this: This case has been in the development stage for about two years, and these folks have spent an awful lot of money to get this case prepared.  It's been a well-tried case.  They've poured their hearts into it.  If I send you home with a mistrial, essentially they're going to have to do this all over again, and 12 more people or 14 people, whatever we start with – we'll end up with 12 -- will have to do it again.

---

[9] The instruction set forth in *Kersey* has since been adopted, nearly verbatim, as Tennessee Pattern Jury Instruction–Civil 15.17 *Instructions as to Unanimous Verdict*.

They've made a really honest effort. They would like you to resolve this problem for them today. I know you're probably tired. This is your third day here. There have been a lot of things and these questions aren't necessarily easy to answer.

. . .

Think about what I've charged you. And I want to remind you that I've asked you, you know, to consult with one another and to reach an agreement if you can do so without violence to your individual judgment. I don't want to emphasize that violent part; I've already talked about that.

But each of you must decide the case for yourself -- I'm reading again -- but do so only after an impartial consideration of the evidence, with your fellow jurors. In the course of your deliberations, do not hesitate -- do not hesitate to reexamine your own views and to change your opinions if you are convinced that your opinion is not correct. But you don't have to -- it says, "Surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow judges [sic]."

It's anticipated that you might not agree. But think about the effect of it and think about whether, in this 15-minute break that you have, whether or not you just have gotten yourself into a corner and maybe you can change your mind.

Following the supplemental instruction, the jury was excused for further deliberations. Sometime thereafter, the parties' attorneys informed the judge that they would accept a majority verdict. Nevertheless, after further deliberation the jury eventually returned a unanimous verdict upholding Ms. Link's 1998 will.

The Contestants argue that the trial court's supplemental instruction in this case constituted a "dynamite charge" similar to those rejected by the Tennessee Supreme Court in *Kersey* and *Steely*. While the trial court's mention of the time and money invested in the case was inadvisable, it does not require reversal in this case for three reasons. First, when the judge informed the parties' attorneys that the jury was deadlocked, he stated, "I can give [the jury] a little dynamite charge. I don't have a written charge to that effect, but explain to them the importance of the jury system, the importance of their efforts to reach a unanimous verdict, and ask them to go back there and stay awhile." Despite the judge's representation that he did not have a written charge prepared, neither party objected. Thus, given the choice between a possible mistrial and an improvised supplemental instruction, both parties chose the latter. Second, the trial

court's supplemental instruction, in large part, tracked the language set forth in both *Kersey* and adopted by the Tennessee Pattern Jury Instructions. The court did not instruct the jury that jurors holding the minority view should surrender their convictions and follow the majority. *See Kersey*, 525 S.W.2d at 140 ("[T]he minority should listen to the views of the majority with the disposition of being convinced."). Similarly, the court did not instruct the jurors that they had a duty to agree. *See Steely*, 556 S.W.2d at 855 ("[I]t is the duty of each and every juror to agree upon a verdict if he can conscientiously do so."). Rather, the trial judge expressly instructed the jurors that they were not required to surrender their honest convictions as to the weight or effect of the evidence solely because of the opinion of their fellow jurors. In our view, a reference to time and money invested in the case, although inadvisable, is not necessarily grounds for reversal when made in the context of an otherwise appropriate supplemental instruction. Third, the record reflects that the parties agreed to accept a majority verdict after the trial court gave its supplemental instruction.[10] As we explained above, the primary concern expressed by courts in rejecting the dynamite charge is that it may impair the right to a unanimous verdict by coercing jurors holding the minority view in deliberations to surrender their beliefs and follow the majority. *See Kersey*, 525 S.W.2d at 144. No such risk exists when, as in this case, the parties have agreed to accept a majority verdict. In light of the foregoing, we conclude that the trial court's supplemental instruction does not require reversal of the jury verdict.

Next, the Contestants submit that the trial judge's *ex parte* communications with the jury require reversal. The Tennessee Supreme Court addressed the propriety of a trial judge's *ex parte* communications with the jury in *Spencer v. A-1 Crane Services, Inc.*, 880 S.W.2d 938 (Tenn. 1994). The *Spencer* Court condemned the practice, stating, "Such communication is always error and should not occur under any circumstances." *Id.* at 941. Nevertheless, it did not hold that every *ex parte* communication requires reversal. *Id.* Instead, it provided the following guidance in determining whether an *ex parte* communication requires reversal:

> The best position seems to us to be that a trial judge's *ex parte* communication with a jury in a civil case does not require reversal per se, but reversal is required where a *timely* complaining party shows specific prejudice or where, owing to the nature of the *ex parte* communication, the reviewing court is unable to determine whether the action was actually harmless.

---

[10] Rule 48 of the Tennessee Rules of Civil Procedure permits parties in a civil action to "stipulate that the jury shall consist of any number less than that provided by law, or that a verdict or a finding of a stated majority of the jurors shall be taken as the verdict or finding of the jury."

*Id.* (emphasis in original) (quoting *Guy v. Vieth*, 754 S.W.2d 601, 605 (Tenn. 1988)).

In this case, the trial judge communicated with the jury off the record and out of the presence of the parties and their attorneys after giving his supplemental instruction. In their post-judgment motion, the Contestants raised the issue as one of 43 alleged errors that they argued necessitated a new trial. Their full discussion of the issue in the motion states, "The trial judge engaged in *ex parte* communications with the jury." The trial judge addressed the issue at its hearing on the post-judgment motion as follows:

> I'm not going to try to go through each and every thing that you put forth, but I think at the end of the day, one of the things that troubles me . . . is number 38, that the trial judge engaged in ex parte communications with the jury. That's a pretty broad statement, and it could be mischaracterized as I sat back there in the jury room and sat around and talked with them, which is not true.

> The event that occurred -- and you all didn't specify what it was, but you hint around it, [was] that after the Court had given the dynamite charge and given the jury an opportunity to step out in the hall and -- or outside and take a break, the foreman or foreperson of the jury sent a message to me in chambers through the bailiff that there had been maybe some intimidation after the jury charge. One witness -- excuse me -- one juror had gone to another juror and said something to the effect [of], "You need to change your vote."

> I wish I had put that on the record. I wish we had gone into the courtroom and I had them put that in writing, but they were instructed to certainly notify me if there was anything of any concern and they did. And, as I said, the better way would have been to have done that in writing.

> But to cure that, I called all of you into my chamber and I outlined for you what had happened. I disclosed it as I knew it and neither of you objected to the manner in which I had handled it. And the manner in which I had handled it was to simply ask that juror, as the instructions called for -- and I think I explained that to you all in chambers -- was to, you know, don't give up on your feelings but be willing to consider the opinions of others. And I simply asked them to do that.

> . . .

- 29 -

Now, with regard to that, I think that's worthy of my having stated it. I think it's clear that you all had an opportunity at the trial or before the verdict to make an objection and no objection was made to the manner in which that was handled. Full disclosure was made of what had happened. And I don't know of any other way to have disclosed it other than that.

The Contestants do not dispute that the trial judge's explanation of the *ex parte* communication is accurate. As such, they implicitly concede that they did not object to the communication after learning about it at trial. Moreover, they have not shown any specific prejudice from the communication. While the Contestants assert that the judge could have engaged in other *ex parte* communications with the jury, there is nothing in the record to suggest that he did. It therefore appears that the judge's only *ex parte* communication with the jury consisted of an attempt to reiterate his previous jury instructions that were made on the record in open court. While the communication was not advisable, it does not require a new trial.

### F. Thirteenth Juror

The Contestants argue that the trial judge misconstrued his role as thirteenth juror and approved the jury's verdict for a reason other than his own satisfaction with the verdict based on an independent evaluation of the evidence. Rule 59.06 of the Tennessee Rules of Civil Procedure provides that a trial court may grant a new trial because the verdict is contrary to the weight of the evidence. When a party moving for a new trial asserts that the jury's verdict was contrary to the weight of the evidence, it is the trial judge's duty to independently weigh the evidence to determine whether it preponderates against the verdict and, if so, to grant a new trial. *Jones v. Tenn. Farmers Mut. Ins. Co.*, 896 S.W.2d 553, 556 (Tenn. Ct. App. 1994). Like the jury, the trial judge is not bound to give any reasons for its decision to grant or deny a new trial based on the preponderance of the evidence. *Cooper v. Tabb*, 347 S.W.3d 207, 221 (Tenn. Ct. App. 2010). When the trial judge approves the verdict without comment, the appellate court will presume that the trial judge adequately performed his or her function as the thirteenth juror. *Id.* However, a statement indicating that the trial judge has misconceived his or her duty is grounds for reversal on appeal. *Shivers v. Ramsey*, 937 S.W.2d 945, 947 (Tenn. Ct. App. 1996).

Here, in its hearing on the Contestants' post-judgment motion, the trial judge stated, "I believe that having sat through that trial, listened to the witnesses, that I think there was sufficient material evidence to support the jury's finding. And as 13th juror, I would not overturn the jury's verdict for that reason." On appeal, the Contestants submit that this statement indicates the judge deferred to the jury's verdict without independently weighing the evidence. We do not share that interpretation of the statement. In our view,

the statement merely indicates the judge's satisfaction that there was sufficient evidence from which the jury could have resolved the case the way it did. This interpretation is consistent with our analysis of similar statements made by trial judges in past cases. *See Washington v. 822 Corp.*, 43 S.W.3d 491, 494-95 (Tenn. Ct. App. 2000) (reaching the same conclusion regarding the trial judge's statement, "It appears to the Court now that the jury verdict in this cause is supported by sufficient evidence and therefore should not be disturbed"). Accordingly, we are satisfied that the trial judge adequately performed his role as the thirteenth juror.

## G. Material Evidence

Finally, the Contestants argue that the jury's verdict is not supported by sufficient evidence in the record. When the trial court approves a jury verdict, the appellate courts may only review the record to determine whether it contains material evidence to support the verdict. *See* Tenn. R. App. P. 13(d); *Overstreet*, 4 S.W.3d at 718. This Court has described material evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration." *White v. Premier Med. Grp.*, 254 S.W.3d 411, 417 (Tenn. Ct. App. 2007) (citations omitted). In determining whether a jury's verdict is supported by material evidence, the appellate court does not determine the credibility of witnesses or weigh evidence. *Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 823 (Tenn. 1994). Rather, it must "(1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence." *In re Estate of Blackburn*, 253 S.W.3d at 613 (citations omitted). If, after doing so, there is material evidence to support the jury's verdict, then the appellate court must affirm the judgment. *Overstreet*, 4 S.W.3d at 718.

The jury found that Ms. Link had the requisite testamentary capacity to execute her 1998 will. The law requires that the testator's mind be sufficiently sound to enable him or her to know and understand the force and consequence of the act of making the will. *In re Estate of Elam*, 738 S.W.2d 169, 171 (Tenn. 1987). The testator must have an intelligent consciousness of the nature and effect of the act, knowledge of the property possessed, and an understanding of the disposition to be made. *Id.* In determining testamentary capacity, the mental condition of the testator at the very time of the will's execution is the only point of inquiry but evidence of the testator's mental condition both before and after making the will, if not too remote in time, may be presented. *Id.* Moreover, if there is a properly executed will, it is presumed that the testator was of sound mind and possessed the requisite testamentary capacity to make the will. *Keasler*, 973 S.W.2d at 216. Here, Carlynn Newcom and Reed Durham both testified that Ms. Link had her "wits about her" in 1998. Don Durham testified that Ms. Link "appeared to

be" in her right mind in 2001. Additionally, Mr. Kelly's handwritten notes from a March 5, 1998 meeting with Ms. Link state, "She was well aware of what she wanted to do." The jury's verdict regarding Ms. Link's testamentary capacity is therefore supported by material evidence.

The jury found that Ms. Link had the requisite testamentary intent to dispose of her property in the manner set forth by her 1998 will. In assessing testamentary intent, "it is immaterial whether a testator necessarily understands that by executing a particular document he is making a will, so long as the document demonstrates it was his clear intention to dispose of his property after his death." *In re Estate of Blackburn*, 253 S.W.3d at 615 (quoting *In re Meade*, 156 S.W.3d 841, 843-44 (Tenn. Ct. App. 2004)). The circumstances surrounding the testator's execution of the document do not indicate testamentary intent. *Id.* Rather, testamentary intent must be determined "from what the testator has written and not from what it is supposed he intended." *Id.* (citations omitted). Ms. Link's 1998 will is titled, "LAST WILL AND TESTAMENT OF GERTRUDE B. LINK." In pertinent part, it states, "I do hereby make the following devise . . . To the First Baptist Church of Jasper, Tennessee, the sum of [$10,000] . . . I do hereby give, devise and bequeath all of the rest, residue and remainder of my estate . . . to my nephew, James Clifford Layne." That language reflects a clear intention to dispose of Ms. Link's property after her death. The jury's verdict regarding Ms. Link's testamentary intent is therefore supported by material evidence.

The jury also found that Ms. Link's 1998 will was not forged and was not the product of undue influence or fraud. A will executed in compliance with all of the formalities of law is presumed to be valid and free from undue influence or fraud. *See In re Estate of Eden*, 99 S.W.3d at 88. Here, Mr. Layne presented evidence that Ms. Link's 1998 will was executed in compliance with all of the requisite legal formalities. Ms. Kelly testified that Mr. Kelly was not available to testify in light of his declining health but identified his signature on the will as a subscribing witness. Ms. Steele identified her signature on the will as a subscribing witness. Ms. Murphy identified her signature on the attached affidavit as the notary. Ms. Kelly, Ms. Steele, and Ms. Murphy each testified regarding Mr. Kelly's procedures when drafting a will for a client. They each explained that Mr. Kelly always met with the client first, alone in his office, to discuss the client's intentions. Mr. Kelly's handwritten notes reflect that he met with Ms. Kelly alone on March 5, 1998, several days before she executed the 1998 will, and that she was "well aware of what she wanted to do." The 1998 will clearly and conspicuously sets forth the manner in which Ms. Link intended to dispose of her property after her death and does not bear any evidence of alteration on its face. The jury's verdict upholding the validity of Ms. Link's 1998 will is therefore supported by material evidence.

## V. CONCLUSION

After careful review, we affirm the trial court's judgment and remand this case to the trial court for any further proceedings that may be necessary and consistent with this Opinion. The costs of this appeal are taxed to the appellants, Carlynn Newcom, Don Durham, and Reed Durham, and their sureties, for which execution may issue if necessary.

_____
ARNOLD B. GOLDIN, JUDGE