# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### June 22, 2023 Session

## BENJAMIN L. FOLKINS ET AL. v. HEALTHCARE GROUP (HONG KONG) CO., LIMITED ET AL.

**Appeal from the Chancery Court for Hamilton County**
**No. 17-0175          Kyle E. Hedrick, Judge**

_____

### No. E2022-00264-COA-R3-CV

_____

The defendants appeal a jury verdict rendered after several days of trial. The parties are former business associates, individuals and entities, who worked together in the manufacturing, importing, distribution, and sale of memory foam mattresses. When one of the plaintiffs withdrew from the business in 2016, he invoked a buyout provision in the parties' operating agreement. The defendants disputed, among other things, the validity of the operating agreement and refused to pay the buyout. A protracted dispute followed, with both the plaintiffs and the defendants alleging several causes of action against one another. Following cross-motions for summary judgment in 2020, the trial court ruled that the operating agreement was not invalid for fraud or unconscionability. The case proceeded to trial on August 3, 2021. The trial lasted several days, and the jury returned a verdict largely in favor of the plaintiffs. The plaintiffs were awarded compensatory and punitive damages, as well as almost a million dollars in attorney's fees. The defendants appealed to this Court, raising a host of issues. We conclude, however, that the trial court erred in refusing to grant the defendants a mistrial on the first day of trial. For the reasons stated herein, we vacate the jury's verdict and the trial court's judgment entered in this matter and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Vacated; Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

W. Neil Thomas, III, and Michael M. Thomas, Chattanooga, Tennessee, for the appellant, China Beds Direct, LLC.

A. Philip Lomonaco, Lenoir City, Tennessee, for the appellant, Healthcare Company Limited.

Robin Ruben Flores, Chattanooga, Tennessee, for the appellant, Healthcare Group (Hong Kong) Co., Limited.

George T. Lewis, Memphis, Tennessee, and Nicholas W. Diegel, Knoxville, Tennessee, for the appellant, Zhanggen (James) Ni.

Gary R. Patrick, Susie Lodico, Cara J. Alday, and McKinley S. Lundy, Jr., Chattanooga, Tennessee, for the appellees, Benjamin L. Folkins and Upward Mobility, Inc.

## OPINION

### BACKGROUND

This case arises from a business divorce. Ben Folkins and his wife, Andrea Folkins, have worked in mattress sales and distribution for many years. Their Tennessee-based business is Upward Mobility, Inc. d/b/a Bed Boss ("Bed Boss"). In approximately 2009, Bed Boss began ordering its mattresses from Healthcare Company, Limited ("Healthcare Co."), a manufacturer in China. At that time, Zhanggen "James" Ni (hereinafter, "Ni") owned Healthcare Co., and it was not a publicly traded corporation. Ni's memory foam pillow and mattress line, MLILY, was already successful in China and Europe but lacked presence in the United States market. After meeting in 2009, Ni and Mr. Folkins decided to go into business together to bring MLILY mattresses to the United States. While Ni handled manufacturing, Mr. Folkins spearheaded the marketing and distribution of MLILY in the United States.

Healthcare Group (Hong Kong) Co., Ltd. ("Group") is a wholly owned subsidiary of Healthcare Co. Ni describes Group as a holding company and investment platform that made it easier for Ni to manufacture and export mattresses made by Healthcare Co. to the United States. When Ni and Mr. Folkins decided to go into business together, they did so by forming China Beds Direct, LLC ("CBD"). Group and Mr. Folkins were CBD's only members. Mr. Folkins contributed $45,000 and initially had a 45% membership interest in CBD, while Group contributed $55,000 and had a 55% membership interest in CBD. In 2011, the parties signed an operating agreement drafted by Mr. Folkins. Early in their relationship, Ni explained that he wished to take Healthcare Co. public on the Shanghai Stock Exchange and that CBD's success would help with Healthcare Co.'s initial public offering ("IPO"). Accordingly, CBD's financial success was very important.

CBD earned approximately 2.5 million dollars in profits in its first year and approximately 6.9 million dollars in profits in 2013. In order to make CBD and MLILY a quick success, Mr. Folkins diverted a lot of resources from his own mattress business, Bed Boss, to CBD. For example, Mr. Folkins persuaded various Bed Boss customers to purchase from CBD, and CBD used Bed Boss's United States Customs and Border Protection and FedEx accounts to efficiently import products from China. CBD also

utilized Bed Boss employees. Healthcare Co. produced mattresses for both CBD and Bed Boss, and Ni ensured that CBD had favorable payment terms so CBD could turn a profit quickly.

Although CBD was successful and the parties worked together with relative ease for a few years, problems eventually arose. According to Mrs. Folkins, Ni and Healthcare Co. unfairly competed with CBD by selling MLILY and/or MLILY knockoffs in CBD's target markets. This angered CBD's distributors and put the Folkinses in a difficult position. Nonetheless, the parties soldiered on. At some point prior to 2015, Ni asked Mr. Folkins to hire an attorney to draft an opinion letter about CBD in preparation for Healthcare Co.'s IPO. Mr. Folkins hired Tennessee attorney John Huisman ("Mr. Huisman"), with whom Mr. Folkins had an existing relationship, in December of 2015. Mr. Huisman advised Mr. Folkins that CBD's operating agreement needed updating because, *inter alia*, the CBD operating agreement referred to Ni and Mr. Folkins as partners, when CBD was a member-managed LLC.

Mr. Huisman drafted a new operating agreement for CBD (the "2016 operating agreement") and sent it to Mr. Folkins on January 7, 2016. Mr. Folkins signed the 2016 operating agreement, and Mr. Huisman then emailed it to Ni for his signature. Mr. Folkins and Healthcare Co. employees were included as recipients on the email. Ni dated the 2016 operating agreement January 9, 2016, and signed his name along with a stamp labeled "Healthcare Co., Ltd." Although the 2016 operating agreement bears Ni's signature, it is undisputed that Ni did not actually read the contract.

According to Mrs. Folkins' testimony, as Healthcare Co.'s IPO approached in the fall of 2016, Healthcare Co. continued selling MLILY knockoffs, angering CBD's distributors. As CBD's distributors continued complaining to Mr. Folkins about their prices being undercut by MLILY knockoffs and market competition by Healthcare Co., tension between the parties came to a head. The parties hit an impasse in the fall of 2016. In October of 2016, Group purchased ten percent of Mr. Folkins' membership interest in CBD for a million dollars, shifting the ownership split in Group's favor. As part of the transaction, Mr. Folkins and Ni entered into a purchase agreement (the "2016 stock agreement"). Around the same time, Healthcare Co. launched its IPO on the public market.

In addition to the hostilities over Healthcare Co.'s competition with CBD, tensions also flared over new business demands made by Ni. Specifically, in 2016, Ni demanded that CBD pay Healthcare Co. on quicker payment terms, stating in a message to Mr. Folkins that CBD needed to grow by itself. Ni also explained that CBD had to raise its prices to its distributors by three to five percent, increase the number of mattresses CBD bought from Healthcare Co. every month, and triple CBD's profits within a year. According to Mr. Folkins, these terms caused him and Mrs. Folkins great stress and created further

problems with CBD's distributors. On the other hand, Ni maintained at trial that the price of raw materials increased significantly in 2016.

In a letter drafted by Mr. Huisman dated December 8, 2016, Mr. Folkins informed Ni that Mr. Folkins was withdrawing as a member of CBD effective September 31, 2017. The letter also reserved Mr. Folkins' rights under a membership buyout provision in the 2016 operating agreement, which provides:

> 5.6 Mandatory Offer on Withdrawal. On the Withdrawal of any Member ("Withdrawing Member"), the remaining Member(s) shall purchase the Shares of the Withdrawn Member on a pro rata basis. The purchase price shall be payable by the delivery of 25% of the purchase price, in cash, at the closing, with the unpaid balance of the purchase price payable over three (3) years. The unpaid balance of the purchase price shall be evidenced by a promissory note of the purchaser(s) that shall provide for commercially reasonable terms and provisions, including security. The purchase price to be paid at the time of the death or withdrawal of a Member shall be five times the average of the two highest years of net earnings of the Company over the immediately preceding five year period.

As a result, Ni ceased Healthcare Co.'s shipping of products to CBD. This upset CBD distributors who no longer had access to MLILY products. CBD's vice president testified there was a breakdown in communication with the Healthcare Co. factory in China following Mr. Folkins' letter. In a February 7, 2017 email to CBD distributors and employees, Ni admitted to stopping orders from Healthcare Co. to CBD but said that the stoppage was because of Mr. Folkins. In response, Mr. Folkins decided to leave CBD effective immediately instead of staying on until September of 2017; accordingly, he sent an email to Ni on February 7, 2017, resigning. While Mr. Folkins maintained that he was entitled to over three million dollars pursuant to the buyout provision of the 2016 operating agreement, Group did not pay.

Mr. Folkins and Bed Boss (hereinafter collectively "Plaintiffs" or "Appellees") filed suit against Ni, Healthcare Co., and Group on March 17, 2017. Mr. Folkins sought to enforce the buyout provision of the 2016 operating agreement, claiming that Group owed him $3,122,500. Plaintiffs also alleged claims for unjust enrichment, breach of contract as to a separate distribution agreement, breach of fiduciary duties owed to CBD, intentional interference with business relationships, procurement of breach of contract, defamation, and conversion. Plaintiffs alleged that punitive damages were appropriate and that Mr. Folkins was entitled to recover his attorney's fees pursuant to another provision in the 2016 operating agreement.

- 4 -

Ni, Healthcare Co., and Group answered and countersued Plaintiffs in October of 2017, adding Mrs. Folkins as a third-party defendant.[1] The parties engaged in protracted litigation, with both sides filing voluminous motions and several amended complaints. Plaintiffs filed their operative complaint on July 17, 2020. Therein, Plaintiffs alleged claims for breach of contract, unjust enrichment, intentional interference with business relationships, procurement of breach of contract, and conversion. Plaintiffs also alleged that the corporate veil should be pierced as to Healthcare Co., Ni, and Group, asserting that "[a]t the time of the events and transactions described above, Healthcare Co. and/or Ni dominated and controlled both [Group's] finances and its policy and business practices relating to the transactions so that [Group] had no separate mind, will, or existence of its own."

Healthcare Co., Group, Ni, and CBD[2] (hereinafter collectively "Defendants" or "Appellants") answered and also filed counter-complaints. Initially, Ni and Healthcare Co. alleged claims for breach of fiduciary duty, conversion, fraud, and unjust enrichment. Group and CBD alleged claims for conversion, unjust enrichment, civil conspiracy, and breach of fiduciary duty. Defendants thereafter filed several amended complaints, the operative complaint filed January 13, 2020.[3] Therein, Healthcare Co., Ni, Group, and CBD alleged claims against Mr. Folkins and Bed Boss for breach of fiduciary duty, conversion, breach of contract, tortious interference with contractual relationships, fraud, and civil conspiracy.

In the interim, the parties disputed the validity of the 2016 operating agreement through cross-motions for summary judgment. Defendants claimed that Mr. Folkins, in

---

[1] All claims against Mrs. Folkins were later dismissed, and she is not a party to this appeal. Mr. Huisman was also sued by the defendants at one point in the litigation but was later dismissed. For ease and brevity, discussion of the litigation involving Mrs. Folkins and Mr. Huisman is largely omitted.

[2] Mr. Folkins originally brought derivative claims on behalf of CBD; however, those were later dismissed in an order entered December 23, 2020.

[3] The many amended answers and amended counter-complaints filed by various combinations of the Defendants render the record difficult to parse. Compounding the confusion is the fact that Defendants have, at various times, been represented by different combinations of counsel, as well as the fact that both Plaintiffs and Defendants initially brought claims on behalf of CBD. The counter-complaint filed on January 13, 2020, was brought by Ni, Healthcare Co., Group, and CBD. Defendants sought and received the trial court's permission to file this complaint. Defendants sought to amend their complaint again on November 6, 2020, specifically seeking leave to file their third amended counter-complaint. No order on this request appears in the record, however. Defendants then filed a successive motion to amend several months later, on March 31, 2021, attempting to add antitrust claims. The trial court denied this request in an order entered May 5, 2021, concluding that it was far too late for another amendment. Consequently, the last counter-complaint filed by Defendants for which they had the requisite leave to amend was the complaint filed January 13, 2020. As best we can discern from the arduous record, the January 13, 2020 counter-complaint is the Defendants' operative complaint.

concert with Mr. Huisman, fraudulently induced Ni to sign the 2016 operating agreement. According to Defendants, this was part of a larger scheme by Mr. Folkins to obtain a substantial buyout upon his later withdrawal from CBD.

Emails in the record establish that Mr. Huisman sent a copy of the 2016 operating agreement first to Mr. Folkins. Upon receiving Mr. Folkins' approval, Mr. Huisman then sent the agreement to Ni and several of Ni's employees. Ni testified in depositions that he did not read the 2016 operating agreement and opined at trial that he did not do so because he trusted Mr. Folkins. Accordingly, on November 2, 2020, Plaintiffs filed a motion for partial summary judgment asking the trial court to determine that the buyout provision of the 2016 operating agreement was valid and not void due to fraud. Plaintiffs asserted that Ni was foreclosed from claiming that the 2016 operating agreement was entered into fraudulently because Ni admitted to signing without reading it. Plaintiffs argued that "[p]arties who sign contracts cannot disclaim their obligations simply because they failed to read them, nor can they claim fraud to escape liability when the alleged undisclosed fact is an unhidden provision in the contract." Plaintiffs also challenged Defendants' contention that the buyout provision rendered the 2016 operating agreement unconscionable, noting that "it is a mutually applicable clause that was signed by sophisticated businessmen in a contract that Ni was not forced to accept as written."

Defendants filed their own motion for summary judgment on November 12, 2020, claiming that Ni, individually, was not a party to the 2016 operating agreement and that the agreement was invalid "as a matter of law based upon the misconduct of Plaintiffs and [Mr.] Huisman, which rendered the operating agreement and the distribution agreement at issue in this matter unconscionable and thus void." Defendants also responded to Plaintiffs' motion on December 17, 2020. Generally, they maintained that genuine disputes of material fact remained regarding whether Mr. Folkins fraudulently induced Ni, on behalf of Group, to sign the 2016 operating agreement. Additionally, Defendants claimed that ambiguity in the buyout provision rendered summary judgment inappropriate. They also claimed that the September 21, 2016 stock sale agreement supplanted the buyout provision and settled in full Mr. Folkins' claim to any buyout upon withdrawal, arguing as follows:

> When he executed the Membership Purchase Agreement, [Mr.] Folkins agreed that the terms of the Membership Purchase Agreement would replace, supplant and invalidate the Withdrawing Member Buyout Provision contained in the 2016 Operating Agreement. Accordingly, [Mr.] Folkins no longer has any legal basis for seeking to enforce the Withdrawing Member Buyout Provision.

\*      \*      \*

[T]he parties confirmed their understanding and agreement that [Mr.] Folkins would not receive any further payment from [Group] in exchange for the transfer of his remaining membership interest in CBD and that any sale/transfer provision contained in any prior agreement of the parties was null and void:

> E. This Agreement contains the entire agreement between the parties regarding the sale of CBD ownership interest. All prior understanding, agreements, promises and representation are of no force or effect, except as specifically set forth in this Agreement.

(Footnote omitted).

The trial court held a hearing on the motions for summary judgment on December 21, 2020. An order was entered by the trial court on January 19, 2021, granting Plaintiffs' motion for partial summary judgment. The trial court noted that Ni admitted to receiving, but not reading, the 2016 operating agreement and determined that the agreement was neither fraudulently induced nor unconscionable. The trial court did not address Defendants' argument regarding the September 21, 2016 stock purchase agreement. Accordingly, Group filed a motion asking the trial court to reconsider its ruling, which the trial court denied. Then, on May 3, 2021, Group filed its own motion for partial summary judgment "on [the] issue of accord and satisfaction." Group reiterated the argument that the 2016 stock purchase agreement rendered the buyout provision of no effect, again pointing to language in the stock purchase agreement:

> The Sale Agreement drafted by Huisman states at paragraph 5 "This agreement contains the entire agreement between the parties regarding the sale of CBD ownership interest. All prior understandings, agreements, promises and representations are of no force and effect except as specifically set forth in this agreement."
>
> *        *        *
>
> Section 5.6 of the Operating Agreement was a prior, understanding, agreement, promise and representation regarding the sale of CBD ownership interest. However, the Sale Agreement rendered § 5.6 of the Operating Agreement a clause without any force and effect.

While the full transcript does not appear in the record, the trial court held a hearing on Group's motion on June 11, 2021. The trial court entered an order denying said motion on July 13, 2021. In pertinent part, this order provides:

This Court received and reviewed the Defendants' motion and statement of undisputed material facts as well as the Plaintiffs' response in opposing and response to the statement of undisputed material facts. This Court also heard and considered argument of counsel and reviewed the record as a whole. The Court finds that there is no written document reflecting the Defendants' claim for accord and satisfaction, there is a sale agreement and a resolution of CBD, neither of which mention any accord and satisfaction, **and there is a prior acknowledgement by the Defendants that there is a question of fact related to any claim for accord and satisfaction.** Based on these findings, set forth in more detail in the transcript of the Court's ruling attached hereto as Exhibit A, it is hereby

ORDERED that the Defendants' Motion for Summary Judgment based on accord and satisfaction is denied.

(Emphasis added).

Trial was set for August 3, 2021, and the parties filed pre-trial briefs in preparation for same. The parties acknowledged that accord and satisfaction was an issue for trial, Plaintiffs opining in their brief filed July 27, 2021, as follows:

The Court has already ruled as a matter of law that Section 5.6 of the 2016 Operating Agreement, which governs the withdrawal of [CBD's] members, is enforceable. **Therefore[,] the only issues remaining on [Mr.] Folkins' claim for breach of that contract are, (1) the sum of the buy-out to which [Mr.] Folkins is entitled, and (2) whether the Defendants' theory of accord and satisfaction is applicable and, if so, whether [Mr.] Folkins' buy-out should be reduced on account of that theory**.

(Emphasis added).

Trial began as scheduled on August 3, 2021, and problems quickly arose. During opening statements, counsel for Healthcare Co. and Ni addressed Defendants' accord and satisfaction argument, explaining that

[I]n September of 2016, James Ni met Andrea Folkins, Ben Folkins, and John Huisman, the attorney, in the back yard of Ben Folkins's yard, and he agreed to give them a million dollars. The agreement states that this makes all prior agreements null and void.

Plaintiffs' counsel objected and, outside the presence of the jury, the trial court held a long, confusing colloquy with all parties' counsel regarding whether accord and satisfaction was

actually a question at issue for the jury. After asking the parties to re-submit the pertinent filings and orders for the trial court's review, the trial court at one point conceded that it had never ruled on accord and satisfaction:

> THE COURT: So here is -- here is where we are and this is what the Court is going to do as follows: Number one, accord and satisfaction is available as a defense because it has never been ruled out by this Court.

Later in the same bench conference, however, the following exchange occurred:

> MR. FLORES: Okay. Judge, so just so I'm clear, does the purchase agreement in toto go to the jury? Is any of it going to be extracted out, redacted, or anything?

> THE COURT: I don't even know what you're asking me.

> MR. FLORES: Okay.

> THE COURT: The purchase agreement is a document in this case.

> MR. FLORES: Okay.

> THE COURT: But you cannot argue that the purchase agreement is a satisfaction of 5.6.

> MR. NEIL THOMAS: I thought he just said we could.

> THE COURT: No, I did not say that. I have never -- there is no -- the purchase agreement is clear on its face. The only thing under the purchase agreement that was exchanged is 100 units for a million dollars, not 100 units for an accord and satisfaction of 5.6.

> MR. FLORES: Well, we're right back to square one, then, Judge. So I --

> THE COURT: Well, that's just -- listen, you can take that up to the Court of Appeals.

> MR. NEIL THOMAS: I know, but --

> MR. LOMONACO: Can we do it right now?

MR. NEIL THOMAS: -- I'm sorry. I thought you just said, I wrote down, we can argue that the purchase agreement is a satisfaction of 5.6.

THE COURT: No. I never said that.

MR. NEIL THOMAS: Well, my hearing --

THE COURT: I have stated so many times the purchase agreement is unambiguous. There was no merger of 5.6 into the purchase agreement. The purchase agreement was a sale according to the clear language of 100 units for a million dollars and it so states. And the Court has already ruled that the purchase agreement may not be used to say that this was a purchase of 450 shares or that it's a satisfaction of 450 shares because it was a purchase of 100 shares.

Later still during this exchange, the following:

THE COURT: All right. Now, having said all of that, the last thing we're going to do is we're going to bring the jury in. I'm going to instruct them with regard to the statement that was made of null and void and that that was simply a misstatement, that the argument is that 5.6 was satisfied, not that it was null and void and that's all the Court is going to say.

MR. PATRICK: And, Your Honor, I think I requested --

THE COURT: And that 5.6 is valid and binding and the question is not whether or not it's not null and void, but whether or not it's been satisfied and the argument that was intended to be made was that it was satisfied.

MR. PATRICK: Thank you.

MR. FLORES: Okay. Judge, we're now back to whether it's satisfied or not.

THE COURT: No. We're back to what he was arguing. All I'm trying to do is -- and if you want to make a suggestion as to a curative instruction, I'm happy to hear it, but he made an argument that it was null and void. Now, I can just simply say that was an inappropriate statement and it's stricken. The only reason I was putting in the other was to lessen the blow on the curative instruction.

MR. NEIL THOMAS: But I thought you just said that the issue is whether 5.6 is satisfied. I thought that's what you just said.

THE COURT: Well, what I'm saying is he was speaking to that, whether or not 5.6 was satisfied, not whether it was null and void. That's all he was saying on his opening statement.

All of the Defendants moved for a mistrial, arguing that their case was severely prejudiced by the trial court's ruling. Defendants pointed out that a large portion of their case was prepared around the understanding that accord and satisfaction was an issue for trial, noting that even Plaintiffs proceeded up to the first day of trial with the same understanding. The trial court did not grant a mistrial and instead gave the jury a curative instruction to disregard counsel's statement that section 5.6 was null and void. Trial proceeded and the jury heard from several witnesses, including Mr. and Mrs. Folkins, Ni, various current and former CBD and Bed Boss employees, CBD distributors, and forensic accountants. Defendants were excluded from arguing or putting forth proof that the September 2016 stock purchase was an accord and satisfaction of the section 5.6 buyout provision in the 2016 operating agreement.

The trial lasted over a week. Following deliberations, the jury returned its verdict, finding largely in favor of Plaintiffs. In relevant part, the jury found that the corporate veil should be pierced as to Group, Healthcare Co., and Ni; Group breached the 2016 operating agreement by refusing to pay Mr. Folkins pursuant to the buyout provision; Defendants intentionally interfered with Bed Boss's business relationships; CBD was unjustly enriched at Bed Boss's expense; Defendants acted intentionally or maliciously; and Bed Boss owed CBD over a million dollars for unpaid goods shipped to Bed Boss. The trial court entered a final judgment on August 30, 2021. Defendants then timely filed motions for new trial and judgment notwithstanding the verdict and engaged in further litigation regarding attorney's fees in front of a special master. On February 8, 2022, the trial court entered an amended final judgment adopting the special master's report and awarding Mr. Folkins $977,634 in attorney's fees and $74,744 in litigation expenses. The trial court also assessed $11,516,067.58 in punitive damages against Healthcare Co. and Ni. Defendants timely appealed to this Court.

## ISSUES

The parties raise several issues on appeal, which are restated slightly.
Ni presents the following issues for review:

1. Whether the trial court erred in denying Ni's motion for directed verdict and new trial where

   a. Plaintiffs provided no evidence to support piercing the corporate veil of any entity in which Ni was a shareholder.

     b. Plaintiffs provided no proof at trial establishing that Ni's conduct caused distributors to terminate their business relationships with Bed Boss.

2. Whether the jury's finding regarding veil piercing must be reversed where the verdict form made a finding of veil piercing mandatory.

3. Whether the admission of Plaintiffs' expert's testimony on causation was erroneous and requires new trial.

4. Whether the trial court erred in awarding punitive damages against Ni because the verdict was not supported by clear and convincing evidence as required by Tennessee law.

5. Whether the punitive damages verdict was entered against the wrong defendant.

6. Whether the punitive damages verdict was also entered as to the wrong plaintiff.

7. Whether the jury verdict form itself is internally inconsistent and demonstrative of jury confusion.

8. Whether the Tennessee punitive damages statute was misapplied.

9. Whether, as calculated and as applied, the punitive damages verdict was unconstitutional.

10. Whether the jury's verdict was tainted by the inclusion of an erroneous jury instruction in the jury charge, the inclusion of which was procured by misrepresentation.

    CBD presents the following issues:

11. Whether any claim of interference by Bed Boss against CBD was pled.

12. Whether the claim of interference by Bed Boss against CBD was supported by proof of causation.

13. Whether the language of the 2016 operating agreement permits a claim for attorney's fees by one member of a limited liability company against another member of the limited liability company based upon an individual claim of that member not involving a claim by or against the limited liability company.

14. Whether the calculation of attorney's fees by the court below was flawed because

    a. The court awarded attorney's fees to Bed Boss for fees it never paid; and

    b. The court failed to segregate reimbursable fees from non-reimbursable fees.

    Group raises the following issues for review:

15. Whether the trial court erred in granting partial summary judgment to Mr. Folkins on Group's defense that Mr. Folkins fraudulently induced the buyout provision as part of an overall scheme of fraud when evidence of fraud was abundant in the record.

16. Whether the trial court's last-minute rulings reversing itself at trial regarding accord and satisfaction, which stripped Group of any defense on the buyout, require a mistrial.

17. Whether the trial court improperly altered the jury verdict form when it sua sponte set a start date for the interest on the damages.

18. Whether the trial court erred when it refused to allow a jury charge on "absurd result" when there was evidence at trial to support such a jury charge.

19. Whether the trial court's refusal to conduct a McDaniel Hearing, and its decisions not to exclude Plaintiffs' expert, which allowed impermissible expert testimony, constitutes reversible error.

    Healthcare Co. presents the following issues for review:

20. Whether the trial court erred in piercing the corporate veils of Co-Defendants' businesses to reach Defendant/Appellant Healthcare Co.

21. Whether the trial court erred in failing to declare a mistrial after its ruling on and handling of Defendants/Appellants' accord and satisfaction defense.

22. Whether the trial court erred by awarding breach of warranty damages against Healthcare Co.

    In his posture as appellee, Mr. Folkins raises the issue of whether he should be awarded attorney's fees on appeal under the indemnity clause in CBD's operating agreement, which the trial court relied upon to award Mr. Folkins his attorney's fees below.

DISCUSSION

This case was tried by a jury. The standard of review for a jury's findings is well-settled:

Regarding the review of a trial by jury, we have previously explained that [w]ith the constitutional underpinning of the right to a jury trial framing the appellate process, Tennessee Rule of Appellate Procedure 13(d) narrowly limits the role of appellate courts in reviewing the factual findings of a jury. *Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 204 (Tenn. Ct. App. [2008]). When the factual foundation of a jury verdict is challenged on appeal, it will only be set aside when there is no material evidence to support it. Tenn. R. App. P. 13(d). Nevertheless, we review the trial court's conclusions of law de novo with no presumption of correctness. *See Elchlepp v. Hatfield*, 294 S.W.3d 146, 149 (Tenn. Ct. App. 2008).

*Smith v. Benihana Nat'l Corp.*, 592 S.W.3d 864, 869 (Tenn. Ct. App. 2019) (quoting *In re Estate of Link*, 542 S.W.3d 438, 451 (Tenn. Ct. App. 2017)). While Defendants raise several issues on appeal regarding the ultimate verdict in this case, we have determined that a more threshold issue is dispositive. We therefore first address the issue regarding the trial court's handling of Defendants' accord and satisfaction defense, which is raised as an issue by both Healthcare Co. and Group.

As discussed at length above, the trial court determined on the first day of trial that accord and satisfaction of section 5.6 of the 2016 operating agreement was not an issue for the jury. Defendants moved for a mistrial, which the trial court denied. Whether to grant a mistrial is well within the discretion of the trial court, and the decision will not be overturned unless the trial court abused that discretion. *DeLapp v. Pratt*, 152 S.W.3d 530, 539 (Tenn. Ct. App. 2004) (citing *State v. Dellinger*, 79 S.W.3d 458, 494 (Tenn. 2002)). "We should not reverse for 'abuse of discretion' a discretionary judgment of a Trial Court unless it affirmatively appears that the Trial Court's decision was against logic or reasoning, and caused an injustice or injury to the party complaining." *McCullough v. Johnson City Emergency Physicians, P.C.*, 106 S.W.3d 36, 47–48 (Tenn. Ct. App. 2002) (citing *Marcus v. Marcus*, 993 S.W.2d 596 (Tenn. 1999)).

"[N]ormally, a mistrial should be declared only if there is a manifest necessity for such action." *State v. Saylor*, 117 S.W.3d 239, 250–51 (Tenn. 2003); *State v. Reid*, 91 S.W.3d 247, 279 (Tenn. 2002). In making the determination whether a mistrial is warranted, "'no abstract formula should be mechanically applied and all circumstances should be taken into account.'" *State v. Mounce,* 859 S.W.2d 319, 322 (Tenn.1993) (quoting *Jones v. State*, 218 Tenn. 378, 403 S.W.2d 750, 753 (1966)).

*State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009). The party seeking a mistrial bears the burden of establishing that a mistrial is necessary. *Teague v. Kidd*, No. E2016-01995-COA-R3-CV, 2017 WL 2299059, at *4 (Tenn. Ct. App. May 25, 2017) (citing *State v. Moss*, No. M2014-00746-CCA-R3-CD, 2016 WL 5253209, at *24 (Tenn. Crim. App. Sept. 21, 2016)).

In this case, the trial court's decision denying Defendants the opportunity to present a defense that all parties prepared to go forward with was both against logic and reasoning, and caused prejudice to the complaining parties. *See McCullough*, 106 S.W.3d at 48. In an order dated July 13, 2021, the trial court expressly stated that genuine disputes of material fact existed regarding the issue of accord and satisfaction. Consequently, all parties prepared for trial under this assumption. Tellingly, Plaintiffs opined in their own trial brief, filed mere days before the start of trial, that "the only issues remaining on [Mr.] Folkins' claim for breach of [the 2016 operating agreement] are, (1) the sum of the buyout to which [Mr.] Folkins is entitled, and (2) whether the Defendants' theory of accord and satisfaction is applicable and, if so, whether [Mr.] Folkins' buyout should be reduced on account of that theory." The trial court ultimately found, however, that it had already ruled this theory out, notwithstanding the fact that the trial court previously ruled that the defense was an issue for trial. The trial court opined in the August 3, 2021 bench conference that it may have indicated, in an oral ruling, a disinclination towards the accord and satisfaction argument. Nonetheless, as pointed out by Defendants at the time, such an oral ruling is inapposite. It is well-settled that a trial court speaks not through oral rulings, but through its written orders. *See Williams v. City of Burns*, 465 S.W.3d 96, 119 (Tenn. 2015) (collecting cases). To the extent the trial court expected the parties to proceed pursuant to an oral ruling in a transcript instead of the written orders in the record, the law was misapplied. *See State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Grp. Tr.*, 209 S.W.3d 602, 610 (Tenn. Ct. App. 2006) (noting that an abuse of discretion can occur when a "trial court has misconstrued or misapplied the controlling legal principles" (citing *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 695 (Tenn. Ct. App. 1999))).

To be sure, trial courts may revise interlocutory, or non-final, orders prior to the entry of a final judgment. *Harris v. Chern*, 33 S.W.3d 741, 744 (Tenn. 2000); *see also* Tenn. R. Civ. P. 54.02. That is not what happened in this case, however. Here, the trial court entered a written order providing that there were genuine disputes of material fact regarding accord and satisfaction that should be decided by the jury. It then disregarded that order at trial, positing that the written order was not actually what the trial court meant. As evidenced by the confusing colloquy quoted above, the trial court seems to have simply misunderstood or misremembered its previous ruling regarding accord and satisfaction. Further, the transcript suggests confusion over the difference in accord and satisfaction and Defendants' argument that the 2016 operating agreement was void due to fraudulent inducement or unconscionability. Defendants' fraud and unconscionability arguments were, undisputedly, disposed of in the trial court's January 19, 2021 order granting

Plaintiffs' motion for partial summary judgment on those defenses. Stated differently, there is no dispute that Defendants were foreclosed, well before trial, from arguing that there was an issue with the *formation* of the 2016 operating agreement. Nothing in that ruling, however, provides that Defendants were then foreclosed from arguing alternative contract defenses at trial. Indeed, the July 13, 2021 order provides just the opposite.

On appeal, Plaintiffs argue that Healthcare Co. and Group have waived this issue by failing to properly object in the trial court, failing to address the issue in post-trial motions, and failing to brief the issue in their principal briefs. We disagree. As reflected in the transcript quoted above, which is a snapshot of what fully transpired the first day of trial, Defendants all vehemently objected to the trial court's handling of the accord and satisfaction defense; indeed, almost two volumes of transcript are devoted to the disagreement. Moreover, Group, Ni, and Healthcare Co. all sufficiently raised this issue in their post-trial motions. Plaintiffs also posit that Defendants' briefing on this issue is deficient pursuant to Tennessee Rule of Appellate Procedure 27, which provides that brief arguments shall contain, *inter alia*, "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record[.]" Plaintiffs point out that Defendants cite no legal authority supporting their position. While we do not disagree, the present case is factually anomalous, particularly the events that transpired the first day of trial. Indeed, our own research revealed no binding case law factually analogous to the case at bar. Moreover, the doctrine of waiver, among other reasons, "generally exists to prevent litigants from raising issues to which their opponents have no opportunity to respond." *Cousins v. Hutton Constr., Inc.*, No. E2021-01251-COA-R3-CV, 2023 WL 1815660, at \*10 n.5 (Tenn. Ct. App. Feb. 8, 2023), *perm app. denied* (May 11, 2023) (quoting *Jackson v. Burrell*, No. W2018-00057-COA-R3-CV, 2019 WL 237347, at \*7 (Tenn. Ct. App. Jan. 16, 2019) (Stafford, J., dissenting), *rev'd on other grounds by Jackson v. Burrell*, 602 S.W.3d 340 (Tenn. 2020)). Inasmuch as the parties spent almost a full day litigating this issue in the trial court, which was also addressed in post-trial motions, Plaintiffs have had fair notice and opportunity to argue their position. The issue is not waived.

Plaintiffs also argue that "the trial court's accord-and-satisfaction rulings at trial reconfirmed orders from well before the trial began," and that the trial court merely "readvised the [Defendants'] attorneys that they could not prove their theory solely with parol evidence." Respectfully, Plaintiffs' own pre-trial brief and the transcript of the bench conference from August 3, 2021 reflect otherwise. Again, the only order in the record squarely addressing Defendants' accord and satisfaction argument clearly states that the issue remained a disputed fact for trial.

While we acknowledge that retrial is a harsh result, particularly given the complexity of this case,[4] we also have no difficulty concluding that the trial court abused its discretion in this instance. Notwithstanding the deferential standard for review, "[t]rial courts' adjudicative decision-making is never completely shielded from appellate review." *Gooding v. Gooding*, 477 S.W.3d 774, 779 (Tenn. Ct. App. 2015) (citing *Knaffl v. Knoxville Banking & Tr. Co.*, 201 S.W. 775, 776 (Tenn. 1918)). The trial court disregarded its previous written order and, as a result, confused the issues regarding formation of contracts versus accord and satisfaction. Defendants[5] prepared for trial under the entirely reasonable belief that accord and satisfaction would be a central issue for the jury and Defendants would have prepared differently but for that belief. As such, the trial court's handling of the accord and satisfaction issue "caused an injustice or injury to the part[ies] complaining." *McCullough*, 106 S.W.3d at 48.

"The trial of a lawsuit is not a game of fox and hounds[,]" *Lowe v. Taylor*, No. 01-A-01-9404-CV00179, 1994 WL 570078, at *2 (Tenn. Ct. App. Oct. 19, 1994), yet in this case, Defendants were taken entirely by surprise at the very last hour. This was a significant, foundational error, and the trial court erred in refusing to grant Defendants a mistrial. As such, we vacate the jury's verdict and the trial court's judgment and remand the case for a new trial. All other issues not specifically addressed are pretermitted.

## CONCLUSION

For the reasons stated herein, the jury's verdict and the trial court's judgment are vacated, and the case is remanded for a new trial and any other further proceedings consistent with this Opinion. Costs on appeal are assessed to the appellees, Benjamin L. Folkins and Upward Mobility, Inc.

_____
KRISTI M. DAVIS, JUDGE

---

[4] The complexity of this case, however, is also partly why a retrial is necessary. While the breach of contract action was only one of several claims that went to the jury, the Defendants and the claims are inextricably intertwined. While we express no opinion on the merits of this argument, Plaintiffs' theory of the case is that Ni, Healthcare Co., and Group are one and the same. And as Defendants aptly pointed out, they all prepared for trial under the impression that accord and satisfaction was a central issue for the jury and would have allocated their time differently but for the trial court's July 13, 2021 order. Thus, given the complex nature of this particular case, it would be inordinately difficult to vacate and remand one claim for retrial and review the remaining issues.

[5] Based on their pre-trial brief, Plaintiffs prepared for trial in the same manner.