IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 5, 2026, Session

## IN RE ESTATE OF RONALD C. PERRY

**Appeal from the Chancery Court for Montgomery County
No. MC-CH-CV-MG-22-5          Kimberly Lund, Chancellor**

_____

### No. M2025-00251-COA-R3-CV

_____

In this probate action, the executor of the decedent's estate alleged that the defendant, who was the decedent's wife, had exercised undue influence over the decedent. Following a bench trial, the trial court dismissed the complaint upon finding that the defendant did not have a confidential relationship with the decedent. The plaintiff has appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which FRANK G. CLEMENT, C.J., and JEFFREY USMAN, J., joined.

Roger A. Maness, Clarksville, Tennessee, for the appellant, Jeffrey Scott Perry, in his capacity as Executor of the Estate of Ronald C. Perry.

B. Nathan Hunt and Marti N. Stuart, Clarksville, Tennessee, for the appellee, Inger Lise Severine.

## OPINION

### I. Factual and Procedural Background

Colonel Ronald C. Perry ("Decedent") was a decorated Vietnam veteran who died on July 30, 2020, in Thomasville, North Carolina. The plaintiff and executor of Decedent's estate is his son, Jeffrey Scott Perry ("Executor"). The defendant, Inger Lise Severine, is Decedent's widow.

On April 1, 2022, Executor filed a complaint in the Montgomery County Chancery Court ("trial court"), alleging that Ms. Severine had unduly influenced Decedent and

converted several of Decedent's bank accounts to circumvent Decedent's Last Will and Testament ("the Will"). Executor claimed that Decedent had been vulnerable to undue influence due to his deteriorating physical and mental health. Executor argued that a legal and family confidential relationship had arisen between Decedent and Ms. Severine when Decedent appointed Ms. Severine as his attorney-in-fact and she assumed more control over the ailing Decedent. According to Executor, Ms. Severine abused her position as attorney-in-fact to convert several of Decedent's financial accounts into joint accounts, which the trial court found included a right of survivorship. Executor also alleged that this conversion frustrated the residuary clause of Decedent's Will, wherein Decedent had bequeathed fifty percent of his residuary estate to Ms. Severine and twenty-five percent to each of his two daughters. As relief to be awarded, Executor requested a monetary judgment and an order directing Ms. Severine to "account for all financial assets of [D]ecedent that have come into her ownership" and "disgorge all of [D]ecedent's assets now in her possession."

Ms. Severine filed an answer on June 22, 2022, denying that she had maintained any type of confidential relationship with Decedent and further denying that Decedent had lacked the mental capacity necessary to understand the consequences of making his bank accounts joint with her. In support, Ms. Severine emphasized that she had never used Decedent's durable power of attorney and highlighted that Decedent had made numerous gifts to his children while alive, none of which Executor had challenged. Ms. Severine did acknowledge that Decedent's physical and mental capabilities had been in decline for some time before his death.

The trial court conducted a bench trial on January 6, 2025. Trial testimony was presented by Executor, Laurie Hadley (Decedent's daughter and beneficiary), Wade Hadley (Ms. Hadley's husband and Decedent's son-in-law), Carol Armistead (Decedent's daughter and beneficiary), and John Crow (counsel who had drafted Decedent's Will and powers of attorney).

Ms. Hadley initially testified regarding Decedent before his meeting Ms. Severine. Ms. Hadley explained that Decedent and his first wife (Ms. Hadley's mother) were parents of six children together. However, that marriage had begun to break down following the death of one of the couple's children in 1981. Ms. Hadley also articulated that her mother refused to relocate and remained in Tennessee when Decedent's employment required him to move to Connecticut in 1982. Ms. Hadley, Mr. Hadley, and Ms. Severine all testified that for the remainder of his life, Decedent visited his Tennessee farm a couple of times each year to assist with hay production and to celebrate Thanksgiving. Ms. Hadley added that her parents had divorced in 2003.

Ms. Severine noted that she had met Decedent during a dance in Connecticut and that they had been together for more than twenty years at the time of his death. She also

explained that after residing with Decedent in Connecticut for a period, the two relocated to North Carolina in 2007. They married in 2013.

Testimony from Executor, Decedent's daughters, and Ms. Severine revealed that Decedent's mental acuity had noticeably declined since 2015, but the witnesses differed as to the pace of the decline and as to when Decedent's mental acumen had significantly degraded. Ms. Hadley, Mr. Hadley, and Ms. Armistead each pointed to an incident in 2018 when Decedent had become lost while driving from Tennessee to North Carolina. By contrast, Ms. Severine indicated the effect of events occurring in April 2019, positing that Decedent was shocked and greatly upset when he learned that one of his sons, Michael Perry, had planned to sell Decedent's farm equipment at auction.[1] In any event, none of the family witnesses denied that Decedent's cognitive capabilities had degraded at least somewhat between 2015 and his death in 2020.

Attorney Crow related that he first met Decedent in 2015 when Decedent introduced himself, implied that he faced a dementia diagnosis,[2] and requested Mr. Crow's services in preparing the Will. According to Mr. Crow, Decedent expressed concerns that Ms. Severine would attempt to influence him and reshape his estate plan. Mr. Crow also confirmed that he had prepared the Will that Decedent had executed and that Ms. Severine had attempted to change the Will herself or through Decedent several times in the years following the Will's execution. In response, Ms. Severine denied that she had ever attempted to alter the Will and insisted that any attempt to change the Will was Decedent's independent idea. It is undisputed that Decedent never amended the Will.

Mr. Crow further related that he had prepared a "Durable General Power of Attorney" ("Durable POA") for Decedent, who had executed the document at Mr. Crow's office on April 3, 2019. Mr. Crow added that he had only agreed to prepare the Durable POA once he had determined Decedent to be of sound mind through a "Mini-Mental State Examination" in which Ms. Severine did not participate. Mr. Crow emphasized that at the time of the Durable POA's execution, he had cautioned Ms. Severine against "self-dealing" with the power of attorney. Conversely, Ms. Severine adamantly denied that Mr. Crow had cautioned her against self-dealing.

Ms. Severine testified that Decedent had also executed a durable healthcare power of attorney ("Healthcare POA") on April 3, 2019, in Mr. Crow's office. Mr. Crow was not questioned regarding the Healthcare POA, and although the Durable POA included a section respecting healthcare records, no separate Healthcare POA appears in the record.

---

[1] According to testimony, once Decedent became upset, Michael Perry postponed the auction until the fall of 2019.

[2] At trial, no one presented any documentary evidence of a dementia diagnosis prior to Decedent's death.

We note that Executor does not dispute the existence of a Healthcare POA appointing Ms. Severine as Decedent's attorney-in-fact concerning healthcare decisions.

Ms. Severine acknowledged that she had accompanied Decedent on April 3, 2019, when he had visited Fortera Credit Union ("Fortera") to change his individual account ownership to that of a joint account with her. Ms. Severine also acknowledged that on November 26, 2019, she had accompanied Decedent when he visited Regions Bank ("Regions"), for the purpose of modifying his individual account to be jointly held. According to Ms. Severine, Ms. Hadley had transported Decedent and Ms. Severine to Regions and had spoken with the bank employee who assisted them in changing the ownership of Decedent's account. Ms. Severine further confirmed that Decedent had signed the account ownership documents himself on these occasions. For her part, Ms. Hadley related that she did remember driving Decedent and Ms. Severine to a bank on an unspecified date in 2019. However, she had been unaware of the errand's purpose and had remained in the bank's waiting area.

The evidence established that Decedent transferred several gifts to family members during the final months of 2019. Mr. and Ms. Hadley each testified that Decedent had tendered $20,000 as a commission for Mr. Hadley's services as realtor in selling Decedent's farm even though Mr. Hadley had agreed not to receive a commission. They also explained that their daughter and son-in-law (Decedent's granddaughter and her husband) had bought Decedent's farm in the summer of 2019. Ms. Severine confirmed that the net proceeds from the farm sale had been $456,000 and that Decedent had deposited the proceeds into a First National Bank account that Decedent owned jointly with Ms. Severine. Ms. Hadley also reported that Decedent had paid $9,000 for plumbing work at the farm. Additionally, Decedent had given Ms. Hadley $100,000 in 2019. Furthermore, Ms. Armistead indicated that during the same year, Decedent had given her $50,000. Concerning these transfers, Ms. Severine elaborated that she had participated in the decisions to make the gifts with Decedent from joint bank account funds. The evidence established that Decedent would typically sign the checks for these gifts once Ms. Severine prepared them.

Additionally, evidence was presented with reference to Decedent's and Ms. Severine's June 2020 visit to Tennessee. Ms. Severine had left after a few days while Decedent had remained for a couple of weeks before returning to North Carolina. Furthermore, Ms. Severine had subsequently contacted Ms. Hadley to inquire whether Ms. Hadley could care for Decedent at her home in Tennessee. Ms. Hadley maintained that she had asked Ms. Severine if there were funds to pay a caregiver, perhaps from an insurer, because Ms. Hadley had sustained injuries during a car accident and was physically incapable of caring for Decedent. Ms. Severine reported that she had become upset upon Ms. Hadley's suggestion inasmuch as she believed that Ms. Hadley was insisting upon compensation to care for her ailing father. Decedent remained in North Carolina with Ms. Severine and did not return to Tennessee following the June 2020 visit.

With respect to Decedent's death, Ms. Hadley had become alarmed in mid-July 2020 when Decedent had stopped answering her phone calls. Ms. Hadley then contacted Ms. Severine, who relayed that Decedent was residing at a healthcare facility in Thomasville, North Carolina. Ms. Severine included that she had employed the Healthcare POA to file a petition for Decedent to be observed in a healthcare facility and later transferred to Thomasville. According to Ms. Severine, Decedent was experiencing Vietnam war flashbacks that had become so frequent and severe that they posed a physical danger to Decedent and others. Ms. Hadley contacted Ms. Armistead and Executor to discuss the situation. Ms. Hadley had investigated how to transfer Decedent to a facility for veterans while Ms. Armistead and Executor had visited Decedent in Thomasville. Decedent remained in Thomasville until he passed away on July 30, 2020. Decedent's death certificate delineated the causes of Decedent's death as "end stage dementia," "possible CVA,"[3] and "hypertension."

Executor began marshalling Decedent's assets in early August 2020 pursuant to Decedent's Will. Mr. Crow reported that following Decedent's death, Ms. Severine had contacted his office, indicating that she intended to accomplish a $10,000 gift to Stephen Perry, the youngest of Decedent's sons, which had been provided for in Decedent's Will. Mr. Crow testified that Ms. Severine had insisted that probate of the estate was unnecessary because she had utilized Decedent's Durable POA to establish Decedent's bank accounts as joint with her. Mr. Crow then confirmed that he had sent a letter in August 2020 to Ms. Severine, requesting that she indicate which accounts were jointly held and distribute the funds in them according to the residuary clause in Decedent's Will.[4]

Upon considering the proof, the trial court entered an order dismissing Executor's complaint on January 23, 2025. In support, the court determined that Ms. Severine and Decedent did not maintain a confidential relationship. The court further ruled that even had a confidential relationship been shown, Executor failed to prove that Ms. Severine exerted undue influence upon Decedent. Executor timely appealed.

## II. Issue Presented

Executor raises one issue for our review, which we have restated slightly:

> Whether the trial court erred by finding that a confidential relationship did not exist between Decedent and Ms. Severine.

---

[3] Cerebrovascular accident, otherwise referred to as a stroke. *See* Merriam-Webster Online Dictionary (2024) (www.merriam-webster.com (derived from Merriam-Webster's Collegiate Dictionary 11th ed.)).

[4] Ms. Severine did not deny that she had contacted Mr. Crow's office and claimed that she had used the Durable POA. However, it is undisputed that Ms. Severine never actually exercised the Durable POA.

## III. Standard of Review

We review the findings of fact in a non-jury case *de novo* upon the record with a presumption of correctness as to the findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). The existence of a confidential relationship is a question of fact. *Smith v. Smith*, 102 S.W.3d 648, 652 (Tenn. Ct. App. 2002). We review conclusions of law *de novo* with no presumption of correctness. *Id.* The trial court's determinations regarding witness credibility carry great weight on appeal, and we will not disturb those determinations absent clear and convincing evidence to the contrary. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

## IV. Existence of a Confidential Relationship

Executor contends that the trial court erred by finding that no legal or family confidential relationship existed between Decedent and Ms. Severine. Executor specified in his complaint that he was alleging the existence of both a legal and family confidential relationship. However, on appeal, he has not differentiated between these types of relationships. Instead, Executor simply posits that the trial court failed to consider the general nature of Decedent and Ms. Severine's relationship and the dominion and control that the relationship exhibited. Although Executor acknowledges that Ms. Severine never exercised the Durable POA, Executor advances the position that the mere existence of the Durable POA naming Ms. Severine as attorney-in-fact "indicate[d] trust and confidence" and "create[d] a confidential relationship." Additionally, Executor points to Ms. Severine's status as Decedent's spouse, Decedent's increased reliance on Ms. Severine for care in late 2019 and early 2020, and her use of the Healthcare POA to admit Decedent to a healthcare facility in July 2020 as evidence of the dominion and control necessary for a confidential relationship. Upon careful review, we determine that the trial court did not err in finding that neither a legal nor a family confidential relationship existed between Decedent and Ms. Severine.

As this Court has explained:

> A grantor seeking to rescind a conveyance based on undue influence has the burden of proving (1) that a confidential relationship existed between the parties wherein the grantee was the dominant party, and (2) that the transaction conferred a benefit on the grantee. *Estate of Fisher ex rel. Meyers v. Rogers*, No. W2001-02506-COA-R3-CV, 2002 WL 31895721, at *2 (Tenn. Ct. App. Dec. 31, 2002). If the grantor establishes these elements, a presumption arises that the conveyance was procured through undue influence, and the burden then shifts to the grantee to prove, by clear and convincing evidence, that the transaction was fair and not the product of undue influence. *Id.*

There are two types of confidential relationships—"legal confidential relationships" and "family and other relationships." *In re Estate of Brevard*, 213 S.W.3d 298, 302 (Tenn. Ct. App. 2006) (citing *Matlock v. Simpson*, 902 S.W.2d 384, 385-86 (Tenn. 1995)). A "legal confidential relationship" is a fiduciary or other relationship where the law prohibits gifts or dealings between the parties. *Id.* at 302-303. These fiduciary relationships are confidential *per se* because of the legal status of the parties, such as attorneys and clients. *Id.* at 303. "Family and other relationships" are not confidential *per se*, and "contestants must prove the elements of domination and control in order to establish the existence of a confidential relationship." *Id.*

*In re Estate of Reynolds*, No. W2006-01076-COA-R3-CV, 2007 WL 2597623, at *8 (Tenn. Ct. App. Sept. 11, 2007) (footnote omitted). We will review each type of confidential relationship in turn.

## A. Legal Confidential Relationship

Executor posits that "the very nature" of a power of attorney "indicates trust and confidence" such that an unrestricted power of attorney creates a confidential relationship by virtue of its existence. Executor also postulates that an unrestricted power of attorney creates a confidential relationship even if not exercised. In support, Executor relies on a footnote from this Court's decision in *In re Estate of Schisler*, 316 S.W.3d 599, 609 n.9 (Tenn. Ct. App. 2009), which states: "An unrestricted power of attorney creates a confidential relationship between the parties." (citing *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995)). Contrary to Executor's argument, however, the *Schisler* Court continued by stating: "[A]n unexercised power of attorney <u>does not</u> in and of itself create a confidential relationship." *Estate of Schisler*, 316 S.W.3d at 609 n.9 (citing *Childress v. Currie*, 74 S.W.3d 324, 329 (Tenn. 2002)) (emphasis added). In *Childress v. Currie*, our Supreme Court instructed that "a confidential relationship does not arise, as a matter of law, when an unrestricted power of attorney is executed but is not exercised." 74 S.W.3d 324, 330 (Tenn. 2002).

Fiduciary relationships—such as guardian and ward, attorney and client, or conservator and incompetent—are legal confidential relationships *per se* "because of the legal status of the parties," not by reason of the presence of dominion and control. *Kelley v. Johns*, 96 S.W.3d 189, 197 (Tenn. Ct. App. 2002). As reviewed above, an unexercised power of attorney does not create a legal confidential relationship *per se*. *See Childress*, 74 S.W. 3d at 329; *Estate of Schisler*, 316 S.W.3d at 609 n.9. Consequently, Executor's emphasis on Ms. Severine's alleged dominion and control over Decedent is unpersuasive as to a legal confidential relationship. We therefore conclude that the trial court properly found no legal confidential relationship between Ms. Severine and Decedent inasmuch as the Durable POA was never utilized.

- 7 -

## B. Family Confidential Relationship

Executor also proffers that "a confidential relationship exists between husband and wife." In support, Executor relies on our Supreme Court's decision in *Bratton v. Bratton*, 136 S.W.3d 595, 601 (Tenn. 2004). *Bratton* involved, *inter alia*, a postnuptial agreement, and, in that context, the *Bratton* Court explained: "Because of the confidential relationship which exists between husband and wife, postnuptial agreements are . . . subjected to close scrutiny by the courts to ensure that they are fair and equitable." *Bratton*, 136 S.W.3d at 601. Executor also cites this Court's decision in *In re Estate of Davis*, 184 S.W.3d 231 (Tenn. Ct. App. 2004), a case involving an antenuptial agreement, for the same legal principle. *See Estate of Davis*, 184 S.W.3d at 238 (quoting *Bratton*, 136 S.W.3d at 601).

However, because these decisions concern postnuptial and antenuptial agreements and not undue influence, *Bratton* and *Estate of Davis* are readily distinguishable from the instant action. Although they generally refer to the marital relationship and the special considerations it merits, neither the *Bratton* Court nor the *Davis* Court concluded that the relationship between husband and wife is *per se* a family confidential relationship. As our Supreme Court has elucidated, "[e]vidence of affection as between persons related by blood or marriage does not show the existence of a confidential relationship." *Halle v. Summerfield*, 287 S.W.2d 57, 62 (Tenn. 1956) (citation omitted). *See Mitchell v. Smith*, 779 S.W.2d 384, 389 (Tenn. Ct. App. 1989) ("The relationships between family members and relatives are not, in and of themselves, confidential relationships." (citing *Halle*, 287 S.W.2d at 62)).

To clarify, the marital relationship is included in the category of familial relationships. "However, even relationships as inherently confidential as family relationships are not confidential *per se,* but require proof of the elements of domination and control." *See In re Estate of Brevard*, 213 S.W.3d 298, 304 (Tenn. Ct. App. 2006) (citing *Kelley*, 96 S.W.3d at 197). *See also Matlock v. Simpson*, 902 S.W.2d 384, 385-86 (Tenn. 1995) (*holding modified on other grounds by In re Estate of Link*, 542 S.W.3d 438 (Tenn. Ct. App. 2017)); *Mitchell*, 779 S.W.2d at 389.

In an effort to prove the requisite dominion and control in the case at bar, Executor highlights Decedent's physical and mental decline, Ms. Severine's role as caretaker for Decedent, and Ms. Severine's eventual use of Decedent's Healthcare POA. The trial court determined this evidence to be insufficient and specifically found:

> [Executor] offered testimony that dominion and control had been exercised over [Decedent] in his last weeks of life, specifically related to his admission to a hospital in North Carolina. However, the Court finds this event was well after all gifts, sales, loans and other transactions had been completed in 2019, the majority of which benefited [Decedent's] children and grandchildren. It

is possible that as [Decedent's] mind became more fragile, Ms. Severine was more a central personality in the relationship, however, there was no testimony that it would have been more dominant than might be expected of a wife who cared for a husband who had both good and bad days. There was simply no showing that [Decedent's] free will was overcome at the time he made the bank accounts joint with his wife on April 3, 2019, and November 26, 2019. The Court does not find Ms. Severine to have exercised dominion and control over [Decedent] at or about the time of the transactions and therefore, there is no "family and other" confidential relationship.

Upon thorough review, we conclude that the evidence supports the trial court's finding that a family confidential relationship did not exist between Decedent and Ms. Severine. The evidence fails to show that Ms. Severine exercised dominion and control over Decedent; rather, it demonstrates that Ms. Severine cared for her aging spouse and helped effectuate his wishes regarding his financial gifts to his children.

## V.  Undue Influence

In its final order, the trial court supplied additional analysis concerning the question of undue influence. Having concluded that the trial court properly found that no confidential relationship existed between Decedent and Ms. Severine, we further conclude that the question of undue influence is pretermitted as moot. *See Estate of Brevard*, 213 S.W.3d at 302 ("[T]he doctrine of undue influence is applicable only where there is a confidential relationship.") (footnote omitted).

## VI.  Conclusion

For the foregoing reasons, we affirm the trial court's judgment dismissing Executor's complaint. We remand this case to the trial court for collection of costs below. Costs on appeal are assessed to the appellant, Jeffrey Scott Perry, in his capacity as the Executor of the Estate of Ronald C. Perry.

s/ Thomas R. Frierson, II
THOMAS R. FRIERSON, II, JUDGE

- 9 -